**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF FLORIDA**
**MIAMI DIVISION**

| | |
|---|---|
| NATURAL EXTRACTION SYSTEMS, LLC<br>Plaintiff,<br><br>vs.<br><br>GREEN THUMB INDUSTRIES INC., GTI Florida, LLC, AND KSGNF, LLC,<br>Defendants. | **JURY TRIAL DEMANDED** |

**COMPLAINT FOR PATENT INFRINGEMENT**

Plaintiff Natural Extraction Systems, LLC, ("NES" or "Plaintiff"), by and through its undersigned counsel, files this Complaint for patent infringement against Defendants, Green Thumb Industries Inc. ("GTI"), GTI Florida, LLC ("GTI Florida"), and KSGNF, LLC ("KSGNF III") (collectively, "Defendants") and alleges as follows:

**NATURE OF THE ACTION**

1. This action for patent infringement arises out of the infringement by Defendants of NES's U.S. Patent No. 10,669,248 ("the '248 patent," Ex. A), U.S. Patent No. 11,643,402 ("the '402 patent," Ex. B), U.S. Patent No. 12,297,181 ("the '181 patent," Ex. C), and U.S. Patent No. 12,420,214 ("the '214 patent," Ex. D) (collectively the "Asserted Patents"). NES brings this action both to compel Defendants to compensate NES for their infringement of the Asserted Patents and to cease their ongoing and continuous infringement of the Asserted Patents.

2. NES is a Colorado-based natural product extraction and distillation technologies company founded by Inventor C. Russell Thomas in 2012.

3. Mr. Thomas founded NES to develop safe, non-addictive, all-natural alternatives to prescription opiates based upon the promising potential of cannabinoids to treat pain,

inflammation, and related conditions.

4. By 2012, eighteen U.S. states had legalized medical cannabis, but orally consumable medicinal cannabis products were typically prepared by extracting cannabinoids from cannabis with fuel-grade butane.

5. Mr. Thomas was concerned about the potentially carcinogenic nature of butane extracts. He performed initial research on rosemary distillates to develop clean and safe alternatives to butane extracts by inventing methods to (i) evaporate aromatic molecules from plant material, (ii) physically separate the evaporated aromatic molecules from the plant material, and (iii) recondense the aromatic molecules into a distillate.

6. The Farm Bill of 2018 legalized consumer products containing cannabidiol ("CBD") derived from industrial hemp containing less than 0.3% tetrahydrocannabinol ("THC"). Mr. Thomas recognized that products made from hemp oils could be safe, non-addictive, all-natural alternatives to prescription opiates for treating pain.

7. Mr. Thomas adapted his research on rosemary to distill hemp oils and manufacture wholesale and retail products from the distillates to treat pain and inflammation.

8. NES filed U.S. Provisional Patent Application No. 62/717,235 ("the '235 application") on August 10, 2018, which discloses methods to distill and activate hemp oils in a single process step. Each of the Asserted Patents claims priority to the '235 application.

9. Each of the Asserted Patents discloses methods to distill and activate cannabinoids in a single process step including the activation of cannabidiolic acid ("CBDA") into CBD and the activation of tetrahydrocannabinolic acid ("THCA") into THC.

10. Upon practicing the methods disclosed in the Asserted Patents, NES received consumer feedback that its resultant hemp oils displayed superior efficacy at treating pain,

inflammation, and other conditions relative to competing cannabinoid products. NES subsequently became the world's leading manufacturer of certified USDA organic hemp extract by volume sold.

11. GTI is one of the largest cannabis operators in the world with more than $1.1 billion in annual revenue and over one hundred marijuana dispensaries in the United States. Ex. Z.

12. The Delaware limited liability company RCP23, LLC ("RCP") and other entities transferred various assets into VCP23, LLC ("VCP") in exchange for shares of the Delaware corporation GTI23, Inc. ("GTI23"), which acquired VCP. The Canada public company Bayswater Uranium Corporation then acquired GTI23 through a reverse takeover in June 2018, and changed its name to "Green Thumb Industries, Inc." such that GTI gained ownership of GTI23 and its subsidiary VCP. *Id.*; Ex. AA.

13. The former shareholders of GTI23 received Super Voting Shares and Multiple Voting Shares of GTI in consideration for GTI23. Ex. AA at 14, 70, 92.

14. On information and belief, the Canada corporation GTI Finco Inc. raised about $64 million Canadian from outside investors and then entered into a three-cornered amalgamation with Bayswater Uranium Corporation and its subsidiary 1165318 B.C. Ltd., a British Columbia corporation, also in June 2018, in which the outside investors received Subordinate Voting Shares of GTI. The Subordinate Voting Shares then traded on the Canadian Securities Exchange. *Id.*

15. On information and belief, GTI owns GTI23, which owns VCP, which owns the Delaware limited liability company GTI Core, LLC ("GTI Core"), which owns GTI Florida, which owns KSGNF III. Ex. Z at 5, F-7, F-8; Ex. AA at 10, 14, 70, 92.

16. On information and belief, (a) the Florida Department of Health granted the Florida sole proprietorship Keith St. Germain Nursery Farms ("KSGNF I") a license to operate a Medical Marijuana Treatment Facility ("MMTC") in October 2017; (b) the Florida limited liability

company KSGNF, LLC ("KSGNF II") was organized the following month and assumed the MMTC license; (c) shortly thereafter, KSGNF II purchased real property situated at 36701 SW 202nd Ave., Homestead, Florida 33034 (the "Homestead Facility"), on which KSGNF III would later cultivate cannabis and make products derived therefrom; (d) KSGNF II executed Articles of Merger of KSGNF II with and into KSGNF III, effective February 2018, which transferred the MMTC license and the Homestead Facility to KSGNF III; (e) KSGNF III operated as Green Glades Farms, LLC prior to executing the Articles of Merger and adopted the name "KSGNF, LLC" upon execution; and (f) the holding company GTI Florida acquired KSGNF III in November 2018, such that GTI gained control of the MMTC license and the Homestead Facility through the corporate structure described in the preceding paragraph. *Id.*; Ex. AE.

17. The MMTC license grants KSGNF III the right to cultivate, harvest, process, sell, dispense, and deliver medical cannabis products in Florida. Ex. Z at 17, F-8.

18. VCP IP Holdings, LLC ("VCP IP") owns trademarks that protect brands including Rise, &Shine, and RYTHM and slogans such as "Cannabis is a Freedom" that Defendants use to market and sell cannabis products in Florida. Ex. AR, Ex. BC, Ex. Q.

19. GTI owns GTI23, which owns VCP, which previously owned VCP IP. Ex. Z at 5, F-8.

20. VCP sold VCP IP to the publicly traded Nevada company Agrify Corporation in August 2025, and Agrify Corporation changed its name to RYTHM, Inc. ("RYTHM"). Ex. AB, Ex. AC.

21. Defendant GTI, via its subsidiary GTI Core, licenses from VCP IP the trademarks for some or all of Defendant's cannabis products marketed and sold in Florida. Ex. AB, Ex. AC, Ex. BD.

22. On information and belief, GTI controls the nature and quality of RISE-branded dispensaries that KSGNF III operates in Florida and the nature and quality of various trademarked products that KSGNF III makes and sells in Florida including Rise, &Shine, and RYTHM-branded products.

23. The brand portfolio that GTI operates is associated with the highest-quality cannabis products in the world in part because GTI operates the brands to deliver consistent products that provide superior effects than nearly all of its competitors.

24. Together, Defendants generate over a billion dollars in annual revenue selling cannabis products including products made with cannabis distillate. Ex. Z.

25. NES derives revenue by licensing its intellectual property.

26. Defendants do not license any intellectual property owned by NES.

27. Defendants' success in the cannabis market comes at the expense of NES and its intellectual property rights.

28. Defendants use processes that fall within the scope of various claims of each of the Asserted Patents.

29. Defendants incorporate cannabis distillate made by processes that infringe various claims of the Asserted Patents into cannabis products such as vaporizers and edibles that Defendants market and sell to consumers in Florida and throughout the United States.

30. The sale of products made with cannabis distillate generates hundreds of millions of dollars in annual revenue for Defendants with no compensation to NES for the use of its intellectual property.

31. NES brings this lawsuit seeking compensation that it is rightfully owed for the unauthorized use of its patented technology by Defendants and an injunction that enjoins

Defendants from further unauthorized use of the patented technology.

## THE PARTIES

32. Plaintiff NES is a limited liability company organized and existing under the laws of the State of Colorado, having a principal place of business in Boulder, Colorado.

33. Defendant KSGNF III is a limited liability company organized and existing under the laws of the State of Florida, with a listed principal address at 325 W. Huron St., Suite 700, Chicago, Illinois 60654, and a registered agent at 1200 S Pine Island Rd, Suite 300, Plantation, Florida 33324.

34. On information and belief, Defendant KSGNF III operates the Homestead Facility in Miami-Dade County, Florida, and at least 22 Rise-branded dispensaries in Florida including the "RISE Dispensary Hallandale Beach" located at 308 N. Federal Highway, Hallandale Beach, Florida 33009, and the "RISE Dispensary Kendall" located at 11611 N. Kendall Drive, Miami, Florida 33173. *See* Ex. E, Ex. F, Ex. Y.

35. Defendant GTI Florida is a limited liability company organized and existing under the laws of the State of Florida, having a principal place of business at 325 W. Huron St., Suite 700, Chicago, Illinois 60654, and a registered agent at 1200 S Pine Island Rd, Suite 300, Plantation, Florida 33324.

36. According to its most recent Form 10-K filed with the SEC, Defendant GTI is a corporation organized and existing under the laws of the Province of British Columbia, Canada, and its principal place of business is at 325 W. Huron St., Suite 700, Chicago, Illinois 60654.

37. GTI describes itself on its website investors.gtigrows.com as, "a leading national cannabis consumer packaged goods company and retailer headquartered in Chicago, Illinois [that] manufactures and distributes a portfolio of branded cannabis products, some of which are licensed,

including RYTHM, Dogwalkers, incredibles, Beboe, &Shine, Doctor Solomon's and Good Green. G[TI] also owns and operates RISE Dispensaries, a rapidly growing national retail chain."

38. KSGNF III is a wholly-owned subsidiary of GTI Florida. *See* Ex. Z at F-8.

39. GTI Florida is a wholly-owned subsidiary of GTI Core. Ex. AA at 10.

40. GTI Core is a wholly-owned subsidiary of VCP. *Id.*

41. On information and belief, GTI is the parent entity of KSGNF III, GTI Florida, GTI Core, and VCP. Ex. Z at F-7, F-8, Ex. AA at 10.

42. On information and belief, Defendant GTI Florida develops, produces, offers for sale, and sells cannabis products in the State of Florida and in the Southern District of Florida through its subsidiary KSGNF III. Ex. Z at F-8.

43. On information and belief, Defendant GTI controls KSGNF III and GTI Florida.

44. On information and belief, Defendant GTI develops, produces, offers for sale, and sells cannabis products through companies owned and operated by its subsidiaries including GTI Florida and KSGNF III in the State of Florida and in the Southern District of Florida.

45. On information and belief, Defendant GTI manufactures and sells cannabis products through Defendants GTI Florida and KSGNF III under several brands including but not limited to RYTHM, Dogwalkers, Good Green, Beboe, Doctor Solomon's, &Shine, and/or incredibles. Ex. G.

## **JURISDICTION AND VENUE**

46. Plaintiff repeats and realleges the allegations contained in Paragraphs 1-45 as though fully set forth herein.

47. This action for patent infringement arises under the patent laws of the United States, 35 U.S.C. § 1 *et seq.*, including 35 U.S.C. § 271.

48. This Court has subject matter jurisdiction over this action under 28 U.S.C. §§ 1331 and 1338.

49. This Court has personal jurisdiction over Defendants because they are incorporated or formed in Florida, have their principal places of business in Florida, or they maintain sufficient minimum contacts with the forum as a result of business conducted within the State of Florida and within the Southern District of Florida so as to bring the exercise of jurisdiction over them within Florida's long-arm statute and to comport with due process. Each maintains sufficient minimum contacts with the forum as a result of business conducted within the State of Florida and within the Southern District of Florida.

50. This Court also has personal jurisdiction over the Defendants because each—either directly or through subsidiaries and/or intermediaries—practices methods that infringe claims of the Asserted Patents in Florida and in this District and makes, uses, offers for sale, sells, advertises, makes available, instructs others to use, and/or markets products made by infringing methods in Florida and in this District.

51. This Court has personal jurisdiction over KSGNF III because KSGNF III is a Florida LLC that is "at home" in Florida, it purposefully availed itself of the privileges of conducting business in Florida, and it sought the protection and benefits of the laws of Florida, and thus, KSGNF III subjected itself to personal jurisdiction in Florida.

52. KSGNF III also maintains several physical, permanent, regular, and established places of business in Florida, at which it has numerous employees and cultivates marijuana, makes cannabis distillate from marijuana, makes retail products from the cannabis distillate, including at the Homestead Facility in Miami-Dade County, a marijuana processing facility situated at 5345 NW 44th Ave., Ocala, Florida 34482 (the "Ocala Facility"), and also sells retail products in at least

22 RISE-branded dispensaries in Florida dispensaries under the MMTC license that KSGNF III obtained when it merged with KSGNF II, including at the "RISE Dispensary Hallandale Beach," the "RISE Deerfield Beach" dispensary, and the "RISE Dispensary Kendall."

53. Thus, KSGNF III committed "torts" in Florida and in this District as defined in Fla. Stat. § 48.193, to wit: acts of infringement of claims of the Asserted Patents.

54. Venue is proper in this District under 28 U.S.C. § 1400 as to KSGNF III because KSGNF III (1) maintains at least one physical, regular, and established place of business in this District and (2) committed acts of direct infringement in this District by practicing processes that infringe claims of the Asserted Patents in this District under 35 U.S.C. § 271(a) and/or by selling products made by processes that infringe claims of the Asserted Patents in this District under 35 U.S.C. § 271(g).

55. KSGNF III has a registered agent for service of process in Florida located at 1200 S Pine Island Rd, Suite 300, Plantation, Florida 33324.

56. On information and belief, KSGNF I obtained its MMTC license, now held and operated by KSGNF III, as an applicant from the Southeast region of Florida, which falls within this District.

57. On information and belief, KSGNF III is the only subsidiary of GTI that holds and operates a Florida MMTC license. *See* Ex. AG at 60, A-1; Ex. Z at F-8.

58. KSGNF III is a subsidiary and alter ego of GTI Florida.

59. GTI Florida does business as "KSGNF, LLC." Ex. AH at 4, *see also* Ex. H, Ex. I, Ex. J, Ex. K, Ex. L, Ex. W, Ex. X.

60. On information and belief, the primary function of GTI Florida is to provide "support services to a state-licensed medical marijuana cultivator, processor, and dispensary

owner," *i.e.*, its wholly-owned subsidiary KSGNF III. Ex. AH.

61. On information and belief, GTI Florida leases and improves real property in Florida where KSGNF III operates RISE-branded dispensaries. *See* Ex. AI, Ex. AJ, Ex. F; Ex. H, Ex. I, Ex. J, Ex. K, Ex. L, Ex. W, Ex. X.

62. This Court has personal jurisdiction over GTI Florida because it is a Florida LLC that is "at home" in Florida, it purposefully availed itself of the privileges of conducting business in Florida, and it sought the protection and benefits of the laws of Florida.

63. GTI Florida actively does business in Florida by providing support services to KSGNF III in Florida including by leasing and improving real property where KSGNF III operates cannabis dispensaries in Florida. Ex. AH at 4, Ex. AI, Ex. AJ.

64. GTI Florida also maintains several physical, permanent, regular, and established places of business in Florida, at which it or its affiliates cultivate marijuana, make cannabis distillate from marijuana, make retail products from the cannabis distillate, including at the Homestead Facility in Miami-Dade County, a marijuana processing facility situated at 5345 NW 44th Ave., Ocala, Florida 34482 (the "Ocala Facility"), and also at multiple RISE-branded dispensaries in Florida. Ex. H, Ex. I, Ex. J, Ex. K, Ex. L, Ex. W, Ex. X.

65. This Court also has personal jurisdiction over GTI Florida, through its alter ego and subsidiary KSGNF III, because it committed "torts" in Florida and in this District as defined in Fla. Stat. § 48.193, to wit: acts of infringement of claims of the Asserted Patents.

66. Venue is proper in the Southern District of Florida under 28 U.S.C. § 1400 as to GTI Florida because GTI Florida (1) maintains at least one physical, regular, and established place of business in this District directly or through its subsidiary and alter ego KSGNF III and (2) committed acts of direct and/or induced infringement in this District by practicing or inducing the

practice of processes that infringe claims of the Asserted Patents in this District under 35 U.S.C. § 271(a) and (b) and/or by selling or inducing the sale of products made by processes that infringe claims of the Asserted Patents in this District under 35 U.S.C. § 271(g).

67. GTI Florida has a registered agent for service of process in Florida located at 1200 S Pine Island Rd, Suite 300, Plantation, Florida 33324.

68. KSGNF III and GTI Florida are subsidiaries and alter egos of GTI. Ex. Z at F-8.

69. KSGNF III, GTI Florida, and GTI are so intermingled and intertwined that they are essentially a single entity and common enterprise. *See*, *e.g.*, Ex. AE, Ex. Z at 5, 6, 8, 9, 15, 17, 39, 52-54, 58, F-7, F-8, Ex. H, Ex. I, Ex. J, Ex. K, Ex. L, Ex. W, Ex. X.

70. This Court has personal jurisdiction over GTI, through its alter egos and subsidiaries GTI Florida and KSGNF III, because it maintains systematic and continuous contacts with Florida, has purposefully availed itself of the privileges of conducting business in Florida, and sought the protection and benefits of the laws of Florida.

71. This Court also has personal jurisdiction over GTI, because its agents, subsidiaries and alter egos KSGNF III and GTI Florida committed "torts" in the State of Florida as defined by Fla. Stat. § 48.193, to wit: acts of infringement of claims of the Asserted Patents in Florida and in this District.

72. Venue is proper in the Southern District of Florida under 28 U.S.C. § 1400 as to GTI because GTI (1) maintains at least one physical, regular, and established place of business in this District directly or through its subsidiaries and alter egos and (2) committed acts of direct and/or induced infringement in this District by practicing or inducing the practice of processes that infringe claims of the Asserted Patents in this District under 35 U.S.C. § 271(a) and (b) and/or by selling or inducing the sale of products made by processes that infringe claims of the Asserted

Patents in this District under 35 U.S.C. § 271(g).

73. KSGNF III and GTI share common ownership with GTI owning 100% of GTI23, which owns 100% of VCP, which owns 100% of GTI Core, which owns 100% of GTI Florida, which owns 100% of KSGNF III.

74. On information and belief, KSGNF III and GTI share and/or have shared common managers and officers.

75. On information and belief, the CEO and Chairman of GTI executed a mortgage agreement secured in part by the Homestead Facility in this District on behalf of KSGNF III and GTI Florida. Ex. AE.

76. On information and belief, the CEO and Chairman of GTI executed agreements on behalf of GTI Florida to lease real property located in this District where the "RISE Dispensary Hallandale Beach" is now located, and the President of GTI executed a Notice of Commencement to improve the property on behalf of both GTI Florida and KSGNF III. *See* Ex. AI, Ex. AJ.

77. On information and belief, the President of GTI is a manager of KSGNF III. *See* Ex. AK.

78. On information and belief, the President of GTI and other employees of GTI including a former Director of Retail Construction at GTI executed at least a half dozen Notices of Commencement to improve real property in this District on behalf of GTI Florida and KSGNF III, where KSGNF III currently operates four different RISE-branded dispensaries.

79. On information and belief, the General Counsel of GTI is the Chief Corporate Counsel of GTI Florida. *See* Ex. AL.

80. On information and belief, the same attorney Jason E. Merritt at the same law firm Greenberg Traurig, LLP represents both KSGNF III and GTI as though they were the same client.

81. On information and belief, GTI owns GTI23, which owns VCP, which owns VCP Real Estate, which owns the Florida limited liability company GTI Sebring Real Estate, LLC, of which the President of GTI is a Manager, and which GTI organized to purchase and own real property in this District for the use and benefit of KSGNF III. Ex. AM.

82. On information and belief, GTI Sebring Real Estate, LLC purchased and presently owns real property in this District.

83. On information and belief, GTI directed GTI Sebring Real Estate, LLC to purchase real property in this District so that KSGNF III could operate a RISE-branded cannabis dispensary on the property and sell cannabis products including those made from cannabis distillate made by processes that infringe various claims of the Asserted Patents.

84. On information and belief, GTI owns GTI23, which owns VCP, which owns VCP Real Estate, which owns the Florida limited liability company GTI Ocala Real Estate, LLC, of which the President of GTI is a Manager, and which GTI organized to purchase, improve, and own real property in Florida, namely the Ocala Facility. *See* Ex. AN, Ex. AO.

85. On information and belief, a former Director of VCP and GTI formed the Florida limited liability company Mosaic Real Estate Ocala, LLC in 2019, which (a) purchased the Ocala Facility for $4.7 million in 2019, (b) leased the Ocala Facility to GTI Florida from 2019 through 2022 in exchange for over $2 million in rent, and then (c) sold the Ocala Facility to GTI Ocala Real Estate, LLC for approximately $5.584 million.

86. On information and belief, GTI Ocala Real Estate, LLC leases the Ocala Facility to KSGNF III. *See, e.g.*, Ex. AP.

87. On information and belief, GTI directed GTI Ocala Real Estate, LLC to purchase and improve the Ocala Facility in Florida so that KSGNF III could manufacture cannabis products

including those made from cannabis distillate made by processes that infringe claims of the Asserted Patents, which KSGNF III presently manufactures at the Ocala Facility and then sells at various RISE-branded dispensaries in Florida including at four RISE-branded dispensaries in this District.

88. On information and belief, the General Counsel of GTI represented both GTI Ocala Real Estate, LLC and KSGNF III in transactions between the two companies. *See id.*

89. On information and belief, GTI Ocala Real Estate, LLC purchased the Ocala Facility for approximately $5.584 million in 2022 and mortgaged the Ocala Facility for $15 million the following year. *See id.*, Ex. Z at F-26, F-28, Ex. AN.

90. On information and belief, a then Senior Manager of Retail Construction for GTI (and now Director of Retail Construction for GTI) executed a Notice of Commencement to improve the Ocala Facility in 2024. *See* Ex. AQ.

91. KSGNF III, GTI Florida, VCP, GTI, and GTI Management, LLC ("GTI Management") share corporate offices and registered mailing addresses, including but not limited to at 325 W. Huron St., Suite 700, Chicago, Illinois 60654.

92. On information and belief, KSGNF III, GTI Florida, and GTI share common ownership, with GTI owning GTI23, which owns VCP, which owns GTI Core, which owns GTI Florida, which owns KSGNF III. Ex. Z at F-7, F-8; Ex. AA at 10, 11.

93. The GTI website gtigrows.com describes RISE—the brand under which KSGNF III operates dispensaries in Florida and in this District—as GTI's primary dispensary brand, without identifying any other entity that actually operates the dispensaries under which name KSGNF IIII operates its dispensaries in Florida and in this District. *See* Ex. M; *see also* Ex. AJ.

94. GTI has repeatedly communicated and ratified that the established places of

business of KSGNF III in Florida, including in this District, are its own places of business. *See* Ex. N.

95. GTI has repeatedly represented that it has a place of business in Florida including in this District. *See*, *e.g.*, *id.*

96. In GTI's annual statement, the CEO of GTI stated that GTI opened more than 100 stores under the RISE dispensary brand, which include 22 dispensaries in Florida and the "RISE Dispensary Hallandale Beach," the "RISE Deerfield Beach" dispensary, and the "RISE Dispensary Kendall" locations in this District. *See* Ex. Z at 5, Ex. Y.

97. GTI's website lists the 22 dispensaries in Florida, including the "RISE Dispensary Hallandale Beach," the "RISE Deerfield Beach" dispensary, and the "RISE Dispensary Kendall" locations in this District, as a place where one can, "[f]ind [the] dispensary nearby, then find [the] path to a happier life." Ex. E, Ex. Y.

98. GTI operates a majority of its nationwide cannabis dispensaries under the trademark "RISE," including at least 22 dispensaries in Florida, including the "RISE Dispensary Hallandale Beach," the "RISE Deerfield Beach" dispensary, and the "RISE Dispensary Kendall" locations in this District. *See* Ex. E, Ex. Y.

99. On information and belief, KSGNF III, GTI Florida, and GTI share the same website risecannabis.com operated by GTI under the RISE trademark. *See* Ex. O.

100. GTI ratifies and holds out each of its retail subsidiaries including KSGNF III as extensions of itself and as part of a single entity having consistent products and a consistent corporate ethos. *See*, *e.g.*, Ex. Z.

101. The annual report that GTI filed with the United States Securities and Exchange Commission ("SEC") for its 2024 fiscal year ("10-K") states, "[GTI], through its subsidiaries,

owns state-licensed medical and/or adult-use cannabis businesses in…Florida…," which refers to the Homestead facility, the Ocala Facility, and 22 RISE-branded dispensaries that KSGNF III operates in Florida pursuant to its MMTC license. *Id.*

102. GTI stated in its 2024 10-K that GTI "vertically integrate[s]" and controls its operations in Florida via its subsidiary KSGNF III, "[a]s our operations in Florida are vertically integrated, we [GTI] are able to cultivate, harvest, process, and sell/dispense/deliver our own medical cannabis products." *Id.* at 17.

103. GTI stated in its 2024 10-K that GTI holds the MMTC license that allows KSGNF III to dispense cannabis products in Florida in its "RISE" branded dispensaries including the "RISE Dispensary Hallandale Beach," the "RISE Deerfield Beach" dispensary, and the "RISE Dispensary Kendall" locations in this District. *Id.*, Ex. Y.

104. GTI stated in its 2024 10-K, "[w]e [GTI] are a holding company and essentially all of our assets are the capital stock of our subsidiaries in our fourteen markets, including . . . Florida." Ex. Z at 39.

105. On the information and belief, GTI represents itself as the operator and owner of the RISE-branded dispensaries that KSGNF III operates in Florida. *See*, *e.g.*, *id.* Numerous press releases and other documents issued by or on behalf of GTI state that GTI operates "RISE Dispensaries" in Florida and in this District. *See*, *e.g.*, Ex. P.

106. On information and belief, GTI represents the revenue and expenses of GTI Florida and KSGNF III as its own revenue and expenses. *See* Ex. Z at 8, 52.

107. On information and belief, GTI owns real property in Florida. On information and belief, GTI owns real property situated in Homestead, Florida in this District and real property situated in Sebring, Florida in this District.

108. On information and belief, GTI financed its operations with a $150 million promissory note secured by the Homestead Facility in this District. Ex. AE.

109. On information and belief, GTI owns GTI23, which owns VCP, which owns GTI Core, which owns VCP Real Estate, which owns GTI Ocala Real Estate, LLC, which owns the Ocala Facility. Ex. AN.

110. On information and belief, GTI financed its operations with a $15 million promissory note secured by the Ocala Facility in Florida. Ex. Z at 6.

111. On information and belief, VCP IP owns the "RISE" trademark, under which KSGNF III operates at least 22 dispensaries in Florida including the "RISE Dispensary Hallandale Beach," the "RISE Deerfield Beach" dispensary, and the "RISE Dispensary Kendall" in this District. *See, e.g.*, Ex. AR; *see also* Ex. AJ, Ex. Q.

112. Florida Trademark T19000000738 protects the RISE mark for use with medical marijuana dispensary services including signages at retail stores and websites. Ex. AR. The specimen that VCP IP filed to renew Florida Trademark T19000000738 is a screenshot of the risecannabis.com website, which, on information and belief, GTI owns and operates. On information and belief, the screenshot advertises a product manufactured by KSGNF III in Florida that KSGNF III either sells or sold at its "RISE Dispensary Bonita Springs" location and at other dispensaries in Florida and in this District.

113. In a Florida trademark application that VCP IP filed on the "RISE" trademark for use with medicinal marijuana dispensary services, VCP IP provided a specimen of a website that advertises the "RISE Deerfield Beach" dispensary that KSGNF III operates in this District. *Id*.

114. The application also contains an affidavit of the President of GTI acting as the Manager of VCP IP. *Id*. The application also includes a notarized statement by a former General

Counsel of GTI acting as the General Counsel of VCP IP, who swore that VCP IP is the owner of the mark and swore that all of the facts stated in the application are true and correct. *Id*. In the application, VCP IP stated that it lacks its own Federal Employer Identification Number (EIN) and instead uses the EIN of VCP. *Id*.

115. On information and belief, GTI controls the nature and quality of RISE-branded dispensaries that KSGNF III operates in Florida including the "RISE Dispensary Hallandale Beach," the "RISE Deerfield Beach" dispensary, and the "RISE Dispensary Kendall" dispensary in this District.

116. On information and belief, GTI owns and operates the website risecannabis.com, which markets products that KSGNF III makes according to methods that infringe various claims of the Asserted Patents and that KSGNF III then sells at RISE-branded dispensaries in Florida including at the "RISE Dispensary Hallandale Beach," the "RISE Deerfield Beach" dispensary, and the "RISE Dispensary Kendall" in this District. Ex. AS.

117. U.S. Trademark No. 7,626,864 protects the "RISE" mark for use with retail stores. On information and belief, the specimens that VCP IP filed in connection with U.S. Trademark No. 7,626,864 are screenshots of the risecannabis.com website that GTI owns and operates, and which markets products that KSGNF III makes and sells in this District including products that infringe various claims of the Asserted Patents.

118. On information and belief, VCP IP owns the "RISE" trademark for use with disposable vape pens, which KSGNF III sells in Florida including at the "RISE Dispensary Hallandale Beach," the "RISE Deerfield Beach" dispensary, and the "RISE Dispensary Kendall" located in this District. *See* Ex. AT, Ex. AU.

119. On information and belief, the RISE-branded disposable vape pens that KSGNF III

makes and sells in Florida and in this District contain cannabis distillate that KSGNF III makes according to methods that infringe various claims of the Asserted Patents.

120. On information and belief, RISE-branded disposable vape pens deliver superior effects to consumers than most competing disposable vape pens.

121. In a Florida trademark application that VCP IP filed on the "RISE" trademark for use with disposable vape pens, VCP IP provided a specimen depicting a RISE-branded cannabis disposable pen. Ex. AT.

122. On information and belief, the RISE-branded cannabis disposable pen was manufactured by KSGNF III in this District. The application also contains an affidavit of the President of GTI acting as the Manager of VCP IP. *Id.* The application also includes a notarized statement by a former General Counsel of GTI acting as the General Counsel of VCP IP, who swore that VCP IP is the owner of the mark and swore that all of the facts stated in the application are true and correct. *Id*. In the application, VCP IP stated that it lacks its own EIN and instead uses the EIN of VCP. *Id*.

123. On information and belief, GTI controls the nature and quality of disposable vape pens that bear the "RISE" mark that KSGNF III makes and sells in Florida.

124. On information and belief, GTI owns and operates the website risecannabis.com, which markets RISE-branded disposable vape pens that KSGNF III makes according to methods that infringe various claims of the Asserted Patents and that KSGNF III sells in Florida including at the "RISE Dispensary Hallandale Beach," the "RISE Deerfield Beach" dispensary, and the "RISE Dispensary Kendall" in this District. Ex. AS.

125. On information and belief, VCP IP owns the "RYTHM" trademark for use with vaporizers and vaporizer cartridges, which KSGNF III sells in Florida including at the "RISE

Dispensary Hallandale Beach," the "RISE Deerfield Beach" dispensary, and the "RISE Dispensary Kendall" in this District. *See* Ex. AV, Ex. AW, Ex. AX, Ex. AY.

126. On information and belief, the RYTHM-branded vaporizer cartridges that KSGNF III makes and sells in Florida and in this District contain cannabis distillate that KSGNF III makes according to methods that infringe various claims of the Asserted Patents.

127. In a Florida trademark application that VCP IP filed on the "RYTHM" trademark, VCP IP provided specimens including (a) a screenshot of the ksgnfllc.com website, which advertises products containing THC distillate and (b) packaging for a "cannabis vape cartridge" that bears the "GTI" acronym, states "Manufactured by KSGNF LLC," and includes the address of the Homestead Facility. Ex. AW.

128. In the same Florida trademark application, VCP IP stated that its EIN was the EIN of KSGNF III. *Id*. On information and belief, KSGNF III previously owned and operated the ksgnfllc.com website, and the website now redirects to risecannabis.com/dispensaries/florida, which GTI owns and operates.

129. In a second Florida trademark application that VCP IP filed on the "RYTHM" trademark for use with vapor pens and vapor cartridges, VCP IP provided a specimen of a screenshot of the risecannabis.com website, which, on information and belief, GTI owns and operates. Ex. AX.

130. The specimen displays RYTHM-branded products sold at the "RISE Dispensary Bonita Springs" in Florida. *Id*. On information and belief, KSGNF III made the RYTHM-branded products depicted in the specimen, and KSGNF III either sells or sold the products depicted in the specimen at dispensaries that it operates in Florida and in this District. The application also contains an affidavit of the President of GTI acting as the Manager of VCP IP. *Id.* The application

also includes a notarized statement by the current General Counsel of GTI acting as the Chief Corporate Counsel of VCP IP, who swore that VCP IP is the owner of the mark and swore that all of the facts stated in the application are true and correct. *Id*. In the application, VCP IP stated that it lacks its own EIN and instead uses the EIN of VCP. *Id*.

131. On information and belief, GTI controls the nature and quality of products that KSGNF III makes and sells that bear the "RYTHM" mark in Florida.

132. On information and belief, RYTHM-branded vaporizers, vapor pens, and/or vapor cartridges deliver superior effects to consumers than most competing products.

133. On information and belief, VCP IP owns the "THE FEEL COLLECTION" mark in Florida for use with medical marijuana and its derivatives. Ex. AZ.

134. In its application for the mark, VCP IP stated that it lacks an EIN and instead uses the EIN of VCP. *Id.* The application includes an affidavit signed by the President of GTI acting as the manager of VCP IP. *Id.* The application also includes a notarized statement by a former General Counsel of GTI acting as General Counsel of VCP IP, who swore that VCP IP is the owner of the mark and swore that all of the facts stated in the application are true and correct. *Id.* The application contains a specimen of packaging for a sativa tincture, which (a) states "THIS PRODUCT CONTAINS THC," (b) characterizes the product as "medical marijuana," (c) bears the "GTI" acronym, (d) states "Manufactured by GTI Florida, LLC," and (e) identifies the address of the Homestead Facility that KSGNF III owns and operates as the address of GTI Florida. *Id.* On information and belief, KSGNF III manufactured the sativa tincture at the Homestead Facility in this District.

135. On information and belief, GTI controls the manufacture and sale of products by its subsidiary KSGNF III in Florida and in this District.

136. KSGNF III sells products in Florida including in this District that bear the name "GTI" and the names of GTI proprietary brands including, for example, &Shine vape cartridges. Ex. R.

137. On information and belief, &Shine-branded vape cartridges deliver superior effects to consumers than most competing vape cartridges.

138. On information and belief, GTI directs and controls the actions, sales, and services of KSGNF III in Florida and in this District, and GTI consented to KSGNF III acting on behalf of GTI in selling, offering to sell, and/or distributing products including products that infringe various claims of the Asserted Patents in Florida and in this District.

139. GTI recruits Florida residents directly and/or through an intermediary for employment inside and outside Florida including in this District. *See* Ex. S.

140. On information and belief, GTI controls the recruiting, hiring, training, and compensation of employees of KSGNF III in Florida and in this District.

141. On information and belief, GTI engaged Greenhouse Software Inc. to hire employees to work for KSGNF III at various locations in Florida including at the "RISE Dispensary Hallandale Beach," the "RISE Deerfield Beach" dispensary, and the "RISE Dispensary Kendall" in this District. *See id.*

142. GTI specifically targets and advertises to consumers in Florida including in this District to sell products made by methods that infringe various claims of the Asserted Patents.

143. GTI announced on its website investors.gtigrows.com that it would open its "RISE Dispensary Ocala" in Florida and quoted the President of GTI as stating, "[w]e are honored to create more job opportunities…while also bringing well-being to more Florida patients." Ex. P.

144. On information and belief, the General Counsel of GTI organized GTI Florida. Ex.

BA.

145. The President of GTI executed the Articles of Organization of GTI Florida as the Registered Agent of GTI Florida. *Id*.

146. GTI Florida acquired KSGNF III the following year such that GTI gained control of KSGNF III through GTI Florida.

147. Shortly after GTI Florida acquired KSGNF III, the CEO and Chairman of GTI executed a Subordination, Non-Disturbance, and Attornment Agreement on behalf of GTI Management and GTI Florida in relation to real property in this District where KSGNF III operates the “RISE Dispensary Hallandale Beach.” Ex. AI.

148. The President of GTI subsequently executed a Notice of Commencement on behalf of GTI Florida, which identifies the lessee of “RISE Dispensary Hallandale Beach” as “GTI Florida LLC/KSGNF, LLC dba Rise Dispensaries.” Ex. AJ.

149. Shortly after GTI Florida acquired KSGNF III and thereby acquired the Homestead Facility, the CEO and Chairman of GTI executed a $150 million mortgage on behalf of GTI Management, GTI Florida, and KSGNF III, which was secured by the Homestead Facility in this District. Ex. AE.

150. On information and belief, the funds provided under the mortgage agreement were used primarily to support efforts to make and sell cannabis products in Florida and in this District including cannabis products made in this District with methods that infringe various claims of the Asserted Patents. *See* Ex. AA at 45.

151. The $150 million mortgage identifies GTI23, VCP, VCP IP, VCP Real Estate, GTI Core, and various other entities that GTI owns and/or controls as “the ‘Borrower.’” Ex. AE.

152. On information and belief, RYTHM acquired VCP IP in August 2025. *See* Ex. AB,

Ex. AC.

153. On information and belief, RYTHM operates the rythminc.com website, which markets various brands that GTI operates including RYTHM, Dogwalkers, incredibles, Beboe, Dr. Solomon, &Shine, and Good Green, and which includes links to various websites that GTI operates that sell products under the various brands. Ex. BB; *see also* Ex. G.

154. The homepage for rythminc.com includes an image of the &Shine trademark, for example, followed by a "LEARN MORE" link that redirects to the risecannabis.com website that, on information and belief, GTI operates. Ex. BB, Ex. AS.

155. On information and belief, VCP IP owns the &Shine trademark. *See, e.g.*, Ex. BC; *see also* Ex. BD at 11.

156. On information and belief, VCP IP filed a specimen in a Florida &Shine trademark application that depicts an &Shine-branded vape cartridge that KSGNF III manufactured in Florida. Ex. BC.

157. On information and belief, KSGNF III filled the &Shine-branded vape cartridge depicted in the specimen with cannabis distillate made according to methods that infringe various claims of the Asserted Patents.

158. On information and belief, KSGNF III markets products that contain cannabis distillate in Florida under the brands RYTHM, Dogwalkers, incredibles, Beboe, Dr. Solomon, &Shine, and/or Good Green.

159. RYTHM comarkets these products on its website rythminc.com. Ex. BB. On information and belief, the cannabis distillate included in such products is made with methods that infringe various claims of the Asserted Patents.

160. The rythminc.com website states:

> RYTHM Inc's portfolio of brands delivers well-being to tens of thousands of Americans every day. The company features some of the most recognized and trusted names in the cannabis and hemp industries, including RYTHM, incredibles, Señorita THC Margaritas, Dogwalkers, Beboe, &Shine and Good Green in thousands of physical locations and online channels. With products rooted in quality, safety, and innovation, the Company is shaping cannabis experiences that enhance daily life. Ex. BB.

161. VCP IP licensed various trademarks to GTI via GTI Core including, "any and all trade secret rights, formulations, know-how, and all other intellectual property rights in the same . . . including recipes for the products marketed under the Trademarks. . . ." Ex. BD.

162. The license agreement states, "Licensee desires to use the Trademarks and the Recipes in connection with cannabis product infusion and production, retail dispensary services, online retail sales of products including cannabis, cannabis concentrates, cannabis infused products, and cannabis accessories, and the marketing and sale of all products contemplated herein. . . ." *Id*.

163. The license agreement expressly identifies the trademark &Shine. *Id.* at 11.

164. The President of GTI signed the license agreement as the authorized signatory of both VCP IP and GTI Core. *Id*. at 10.

165. On information and belief, the majority owner of GTI Management, the Chairman and CEO of GTI, and the Chairman and interim CEO of RYTHM are the same natural person. *See* Ex. AA at 70, Ex. AB, Ex. AC.

166. On information and belief, GTI owns GTI23, which owns VCP, which owns the Delaware corporation For Success Holding Company, which owns the California limited liability company Wellness Mgmt, LLC, which owns the Delaware limited liability company RSLGH, LLC ("RSLGH"). Ex. Z at 5, F-7, F-8; Ex. AB, Ex. AC, Ex. AD; *see also* Ex. AA at 10, 11, 14, 70, 92.

167. RSLGH filed SEC Schedule 13D stating that RLSGH has a "control purpose" in acquiring voting power in RYTHM. Ex. AD.

168. The majority owner of GTI Management executed SEC Schedule 13D to certify that "this statement is true, complete and correct" of behalf of GTI, GTI23, VCP, For Success Holding Company, and Wellness Mgmt, LLC; and the General Counsel of GTI executed the same Schedule 13D on behalf of RSLGH. *Id.*

169. The SEC Schedule 13D states that Common Stock of Agrify Corporation (now RYTHM) is:

> beneficially owned by (1) RSLGH, LLC, a Delaware limited liability company ("RSLGH"); (2) Wellness Mgmt, LLC, a California limited liability company and the sole member of RSLGH ("Wellness Mgmt"); (3) For Success Holding Company, a Delaware corporation and the sole member of Wellness Mgmt ("For Success Holding"); (4) VCP23, LLC, a Delaware limited liability company and the sole shareholder of For Success Holding ("VCP23"); (5) GTI23, Inc., a Delaware corporation and the sole member of VCP23 ("GTI23"); and (6) Green Thumb Industries Inc., a British Columbia corporation and the sole shareholder of GTI23 ("GTI" or "Green Thumb") (RSLGH, Wellness Mgmt, For Success Holding, VCP23, GTI23 and GTI, collectively, the "Reporting Persons"). *Id.*

170. The SEC Schedule 13D states that the aggregate Common Stock of RYTHM that the Reporting Persons beneficially own represents 49.99% of the voting power and dispositive power of RYTHM. *Id.*

171. On information and belief, the majority owner of GTI Management personally owns at least 20,000 shares of Common Stock of RYTHM, which control greater than 0.11% of the voting power and dispositive power of RYTHM. Ex. BE.

172. On information and belief, the majority owner of GTI Management presently controls over 50.1% of the voting power and dispositive power of RYTHM because he personally owns over 0.11% of RYTHM and because he controls another 49.99% interest in RYTHM as CEO

and Chairman of GTI.

173. On information and belief, the majority owner of GTI Management is the Secretary, President, CEO, Chairman, Principal Executive Officer, and "Chief Operating Decision Maker" of RYTHM. Ex. AC, Ex. BF, Ex. BG.

## THE ASSERTED PATENTS

174. Plaintiff repeats and realleges the allegations contained in Paragraphs 1-173 as though fully set forth herein.

175. The '248 patent, entitled "Methods to Chemically Modify Cannabinoids," was duly and legally issued by the United States Patent and Trademark Office ("USPTO") on June 2, 2020, and names C. Russell Thomas and Matthew M. DePalo as inventors. A true and correct copy of the '248 patent is attached as Exhibit A.

176. The '248 patent is valid and enforceable.

177. Messrs. Thomas and DePalo assigned their inventions as disclosed in the '248 patent to NES. NES is the owner by assignment of all rights, title, and interest to and in the '248 patent with the sole right to enforce the '248 patent and sue for infringement.

178. The '402 patent, entitled "Gas Phase Methods to Decarboxylate Cannabinoids," was duly and legally issued by the USPTO on May 9, 2023, and names C. Russell Thomas and Matthew M. DePalo as inventors. A true and correct copy of the '402 patent is attached as Exhibit B.

179. The '402 patent is valid and enforceable.

180. Messrs. Thomas and DePalo assigned their inventions as disclosed in the '402 patent to NES. NES is the owner by assignment of all rights, title, and interest to and in the '402 patent with the sole right to enforce the '402 patent and sue for infringement.

181. The ’181 patent, entitled “Methods to Chemically Modify Cannabinoids,” was duly and legally issued by the USPTO on May 13, 2025, and names C. Russell Thomas and Matthew M. DePalo as inventors. A true and correct copy of the ’181 patent is attached as Exhibit C.

182. The ’181 patent is valid and enforceable.

183. Messrs. Thomas and DePalo assigned their inventions as disclosed in the ’181 patent to NES. NES is the owner by assignment of all rights, title, and interest to and in the ’181 patent with the sole right to enforce the ’181 patent and sue for infringement.

184. The ’214 patent, entitled “Methods to Produce Products Comprising Cannabinoids,” was duly and legally issued by the USPTO on September 23, 2025, and names C. Russell Thomas and Matthew M. DePalo as inventors. A true and correct copy of the ’214 patent is attached as Exhibit D.

185. The ’214 patent is valid and enforceable.

186. Messrs. Thomas and DePalo assigned their inventions as disclosed in the ’214 patent to NES. NES is the owner by assignment of all rights, title, and interest to and in the ’214 patent with the sole right to enforce the ’214 patent and sue for infringement.

## **FACTUAL BACKGROUND & DEFENDANTS’ INFRINGEMENT**

### **A. The ’248 Patent**

187. Plaintiff repeats and realleges the allegations contained in Paragraphs 1-186 as though fully set forth herein.

Claim 1 of the ’248 patent recites:

> A method to chemically modify a cannabinoid molecule, comprising:
>
> providing a composition comprising cannabinoids, in which the cannabinoids comprise a native cannabinoid molecule, the native cannabinoid molecule comprises a carboxyl group, and the native cannabinoid molecule is in a liquid phase or a solid phase;

> contacting the composition with sufficient energy to convert the native cannabinoid molecule into (i) a carbon dioxide molecule and (ii) modified cannabinoid molecule in a gas phase;
>
> contacting the modified cannabinoid molecule with a heat sink to condense the modified cannabinoid molecule into a condensed cannabinoid molecule in a liquid distillate, in which at least 95% of the native cannabinoid molecule is converted into the condensed cannabinoid molecule per mole; and
>
> collecting the liquid distillate.

188. Claim 2 of the ’248 patent recites:

> A method to chemically modify a cannabinoid molecule, comprising:
>
> providing a composition comprising cannabinoids, in which the cannabinoids comprise a native cannabinoid molecule, the native cannabinoid molecule comprises a carboxyl group, and the native cannabinoid molecule is in a liquid phase or a solid phase;
>
> contacting the composition with sufficient energy to convert the native cannabinoid molecule into (i) a carbon dioxide molecule and (ii) a modified cannabinoid molecule in a gas phase;
>
> contacting the modified cannabinoid molecule with a heat sink to condense the modified cannabinoid molecule into a condensed cannabinoid molecule in a liquid distillate; and
>
> collecting the liquid distillate, in which the liquid distillate comprises the condensed cannabinoid molecule and cannabinol at a molar ratio greater than 100:1.

189. Claim 8 of the ’248 patent recites:

> A method to chemically modify a cannabinoid molecule, comprising:
>
> providing a composition comprising cannabinoids, in which the cannabinoids comprise a native cannabinoid molecule, the native cannabinoid molecule comprises a carboxyl group, and the native cannabinoid molecule is in liquid phase or a solid phase;
>
> coating a heated surface with the composition at a surface-area-to-volume ratio of the composition that is greater than 500 per meter;
>
> contacting the composition with sufficient energy to convert the

> native cannabinoid molecule into (i) a carbon dioxide molecule and (ii) a modified cannabinoid molecule in a gas phase;
>
> contacting the modified cannabinoid molecule with a heat sink to condense the modified cannabinoid molecule into a condensed cannabinoid molecule in a liquid distillate; and
>
> collecting the liquid distillate.

190. Claim 12 of the ’248 patent recites:

> A method to chemically modify a cannabinoid molecule, comprising:
>
> providing a composition comprising cannabinoids, in which the composition has a surface-area-to-volume ratio greater than 1000 per meter; the cannabinoids comprise a native cannabinoid molecule; the native cannabinoid molecule comprises a carboxyl group; and the native cannabinoid molecule is in a liquid phase or a solid phase;
>
> contacting the composition with sufficient energy to convert the native cannabinoid molecule into (i) a carbon dioxide molecule and (ii) a modified cannabinoid molecule in a gas phase;
>
> contacting the modified cannabinoid molecule with a heat sink to condense the modified cannabinoid molecule into a condensed cannabinoid molecule in a liquid distillate; and
>
> collecting the liquid distillate.

191. On information and belief, Defendants make cannabis distillate with methods that satisfy each and every limitation of at least claims 1, 2, 8, and 12 of the ’248 patent either literally or under the doctrine of equivalents.

192. Cannabis flowers contain a variety of naturally occurring molecules called cannabinoids. CBDA is a native cannabinoid molecule found naturally in various strains of the cannabis plant. THCA is another native cannabinoid molecule found naturally in various strains of the cannabis plant.

193. Defendants extract cannabis oil from cannabis plants. The resultant cannabis extracts contain the native cannabinoid molecules CBDA and/or THCA.

194. CBDA lacks robust medicinal effects. CBDA may be converted into CBD by a chemical process called decarboxylation.

195. THCA lacks robust psychoactive effects. THCA may be converted into the psychoactive molecule THC by decarboxylation. THC and its active metabolite 11-hydroxy-Δ9-tetrahydrocannabinol display psychoactive effects.

196. CBDA and THCA each comprise a carboxyl group.

197. Decarboxylation removes the carboxyl group from the CBDA molecule to form a CBD molecule and a carbon dioxide molecule.

198. Decarboxylation removes the carboxyl group from the THCA molecule to form a THC molecule and a carbon dioxide molecule.

199. Defendants make cannabis distillate with methods that modify the native cannabinoid molecule CBDA to form CBD and carbon dioxide and/or that modify the native cannabinoid molecule THCA to form THC and carbon dioxide.

200. Cannabinol ("CBN") is a thermal oxidation product of THCA.

201. CBN can cause drowsiness, paranoia, and confusion in humans.

202. Decarboxylating THCA under certain conditions converts some of the THCA into CBN.

203. Defendants make and sell products made with cannabis distillate containing greater than 80% THC by mass and less than 0.8% CBN by mass such as the &Shine NORTHERN LIGHTS Distillate Cartridge, which Defendants make and sell in Florida and throughout the United States including at the "RISE Dispensary Hallandale Beach," the "RISE Deerfield Beach" dispensary, and the "RISE Dispensary Kendall" that KSGNF III operates in this District. Ex. T. The molar ratio of THC to CBN in such products is greater than 100:1.

204. Defendants make and sell other products made with cannabis distillate containing greater than 80% THC by mass and less than 0.8% CBN by mass such as the &Shine Durban Poison cartridge and the &Shine XJ-13 cartridge, which Defendants make and sell in Florida and throughout the United States including at the "RISE Dispensary Hallandale Beach," the "RISE Deerfield Beach" dispensary, and the "RISE Dispensary Kendall" that KSGNF III operates in this District. Ex. U, Ex. BH, Ex. BI, Ex. BJ. The molar ratio of THC to CBN in such products is greater than 100:1.

205. On information and belief, Defendants practice the methods disclosed and claimed in the Asserted Patents to produce cannabis distillates that comprise greater than 80% THC and less than 0.8% CBN.

206. On information and belief, Defendants practice the methods disclosed and claimed in the Asserted Patents to produce cannabis distillates that comprise a molar ratio of THC to CBN of greater than 100:1.

207. On information and belief, Defendants distill compositions comprising cannabinoids by short-path distillation to make cannabis distillate in Florida. Ex. V, Ex. BK, Ex. BL.

208. The risecannabis.com website that GTI operates states:

> At RISE dispensaries, you'll find an array of top-tier brands, including the premium products crafted by Green Thumb Industries (GTI). Known for brands like RYTHM, Dogwalkers, incredibles, Beboe, Dr. Solomon, &Shine and Good Green, RISE Dispensary Premium products focuses on creating safe, consistent cannabis that stands out from the crowd. But what makes their products stand out?
> * * *
> **Consistency in Every Batch:**
> Whether it's your first time buying or you're a regular, RISE Dispensary products deliver the same high-quality experience each time, thanks to their meticulous production processes.
>
> Ex. BM.

209. On information and belief, to ensure the consistency of their products, Defendants perform the same or similar methods to make cannabis distillate in Florida as they and/or their affiliates perform in other states.

210. A "Production Supervisor at Green Thumb Industries (GTI)" stated on LinkedIn that her responsibilities included to "[o]versee and support cannabis laboratory functions including . . . [o]peration and maintenance of . . . KDT distillation system." Ex. BN.

211. On information and belief, Defendants' "KDT distillation system" is a wiped-film distillation system manufactured by Chemtech Services, Inc. (Illinois, United States). *See, e.g.*, Ex. BO.

212. Wiped-film distillation is a type of short-path distillation. *Id.*

213. A "Laboratory Technician at Green Thumb Industries (GTI)" stated on LinkedIn that he "[e]xecuted roller film distillation, using Delta Separations System" in relation to his work with GTI. Ex. BP.

214. Roller-film distillation is a type of short-path distillation.

215. On information and belief, Defendants distill compositions comprising cannabinoids by wiped-film and/or roller-film distillation to make cannabis distillate in Florida.

216. On information and belief, compositions that Defendants provide for distillation comprise the native cannabinoid molecule THCA.

217. The input to Defendants' short-path distillation systems is a liquid. *See, e.g.*, Ex. BO.

218. On information and belief, Defendants manufacture cannabis distillates using processes that lack a separate decarboxylation step, in which a cannabis extract is heated above 212° Fahrenheit to convert THCA into THC prior to distillation.

219. On information and belief, Defendants operate one or more short-path distillation systems by providing a composition that comprises liquid-phase THCA.

220. On information and belief, Defendants operate one or more short-path distillation systems by contacting compositions comprising cannabinoids with sufficient energy to evaporate cannabinoids (by heating the extracts to an elevated temperature) such that the cannabinoids enter a gas phase as a vapor.

221. On information and belief, Defendants contact compositions comprising cannabinoids with energy to evaporate cannabinoids, and the energy converts the native cannabinoid molecule THCA into (i) a carbon dioxide molecule and (ii) a modified cannabinoid molecule, *i.e.*, THC, in a gas phase.

222. On information and belief, in short-path distillation systems, Defendants condense gas phase THC into a liquid distillate by contacting the gas-phase THC with a cold trap. *See, e.g.*, Ex. BO.

223. The cold trap in Defendants' short-film distillation systems are heat sinks.

224. On information and belief, Defendants collect distillate from one or more short-path distillation systems, which Defendants use to make products that contain the distillate.

225. On information and belief, Defendants make and sell products that comprise cannabis distillate containing THC and less than 0.1% THCA, for example, the &Shine (Destress) 300mg pen and the &Shine Pineapple Express vape cartridge. *See, e.g.*, Ex. BQ, Ex. BR.

226. Thus, on information and belief, the distillation process used to make the distillate contained in these products converts at least 95% of the native cannabinoid molecule THCA of the provided cannabinoid composition into THC.

227. On information and belief, Defendants make and sell products that contain distillate

that comprises greater than 80% THC, less than 0.8% CBN, and a molar ratio of THC to CBN of greater than 100:1. *See* Ex. R, Ex. T, Ex. U, Ex. BI, Ex. BR.

228. On information and belief, the wiped-film distillation system(s) that Defendants operate each comprise a mechanical wiper that spreads compositions comprising cannabinoids into a thin film across a heated surface. *See* Ex. BO.

229. On information and belief, the heated surface of each wiped-film distillation system that Defendants operate comprises a cylindrical inner surface. *See id.*

230. On information and belief, Defendants operate one or more wiped-film distillation systems by spreading compositions comprising cannabinoids into a thin film across the heated surface of each wiped-film distillation system. *See id.*

231. On information and belief, the roller-film distillation system(s) that Defendants operate each comprise a mechanical roller that spreads compositions comprising cannabinoids into a thin film across a heated surface.

232. On information and belief, the heated surface of each roller-film distillation system that Defendants operate comprises a cylindrical inner surface.

233. On information and belief, Defendants operate one or more roller-film distillation systems by spreading compositions comprising cannabinoids into a thin film across the heated surface of each roller-film distillation system.

234. On information and belief, each wiped-film and roller-film distillation system operated by Defendants produces a film that has a thickness of 100 to 500 microns.

235. The film having a thickness of 100 to 500 microns on the cylindrical surface of the wiped-film and/or roller film distillation systems operated by Defendants has a surface-area-to-volume ratio that is greater than both 1,000 per meter and 500 per meter.

**B. <u>The ’402 Patent</u>**

236. Plaintiff repeats and realleges the allegations contained in Paragraphs 1-235 as though fully set forth herein.

237. Claim 1 of the ’402 patent claims:

> A method to chemically-modify a cannabinoid molecule, comprising:
>
> providing a composition comprising cannabinoids wherein the composition has a surface-area-to-volume ratio that is greater than 1000 per meter; the cannabinoids comprise a native cannabinoid molecule; the native cannabinoid molecule comprises a carboxyl group; and the native cannabinoid molecule is in either a liquid phase or a solid phase;
>
> contacting the composition with sufficient energy to convert the native cannabinoid molecule into (i) a carbon dioxide molecule and (ii) a modified cannabinoid molecule in a gas phase;
>
> contacting the modified cannabinoid molecule with a heat sink to condense the modified cannabinoid molecule into a condensed cannabinoid molecule in a liquid distillate; and
>
> collecting the liquid distillate.

238. Claim 8 of the ’402 patent depends from Claim 1 and recites:

> contacting the composition with the sufficient energy comprises conductively heating the composition.

239. Claim 14 of the ’402 patent depends from Claim 1 and recites:

> the liquid distillate comprises one or both of cannabidiol and tetrahydrocannabinol at a combined concentration of greater than 6 percent by weight; and
>
> the liquid distillate comprises cannabinol at a concentration of less than 0.8 percent by weight.

240. Claim 15 of the ’402 patent depends from Claim 1 and recites:

> the liquid distillate comprises each of cannabidiol, tetrahydrocannabinol, and cannabigerol.

241. Claim 18 of the ’402 patent depends from Claim 1 and recites:

the native cannabinoid molecule is cannabigerolic acid;
the modified cannabinoid molecule is cannabigerol; and
the condensed cannabinoid molecule is cannabigerol.

242. On information and belief, Defendants make cannabis distillate with methods that satisfy each and every limitation of at least claims 1, 8, 14, 15, and 18 of the ’402 patent either literally or under the doctrine of equivalents.

243. On information and belief, Defendants perform short-path distillations, including wiped-film and roller-film distillations, on compositions comprising cannabinoids to make cannabis distillate. *See*, *e.g.*, Ex. V.

244. On information and belief, the wiped-film distillation system(s) that Defendants operate each comprise a mechanical wiper that spreads compositions comprising cannabinoids into a thin film across a heated surface.

245. On information and belief, the roller-film distillation system(s) that Defendants operate each comprise a mechanical roller that spreads compositions comprising cannabinoids into a thin film across a heated surface.

246. On information and belief, the heated surface of each wiped-film and roller-film distillation system that Defendants operate comprises a cylindrical inner surface. *See, e.g.*, Ex. BO.

247. On information and belief, each wiped-film and roller-film distillation system operated by Defendants produces a film that has a thickness of 100 to 500 microns.

248. The film having a thickness of 100 to 500 microns on the cylindrical surface of the wiped-film and/or roller film distillation systems operated by Defendants has a surface-area-to-volume ratio that is greater than 1,000 per meter.

249. Defendants’ wiped-film and roller-film distillation systems transfer energy from heated surfaces to the thin films of liquid that are spread across the heated surfaces.

250. Transferring energy from a heated surface to a thin film of liquid that is spread across the heated surface is a form of conductive heating.

251. Defendants' short-path distillation systems transfer energy by conductive heating.

252. On information and belief, Defendants operate their short-path distillation systems to make liquid distillates that comprise CBD and/or THC at a combined concentration of greater than 6% by weight. *See, e.g.*, Ex. R, Ex. T, Ex. U, Ex. BI, Ex. BQ, Ex. BR.

253. On information and belief, Defendants operate their short-path distillation systems to make liquid distillates that comprise CBN at a concentration of less than 0.8% by weight. *See, e.g.*, Ex. R, Ex. T, Ex. U, Ex. BI, Ex. BQ, Ex. BR.

254. On information and belief, Defendants practice the methods disclosed and claimed in the Asserted Patents to make cannabis distillates that contain greater than 70% THC, greater than 2% cannabigerol ("CBG"), and less than 1% cannabichromene ("CBC"). *See, e.g.*, Ex. R, Ex. U, Ex. BI, Ex. BQ.

255. Cannabigerolic acid ("CBGA") is native cannabinoid molecule found naturally in various strains of the cannabis plant.

256. Defendants extract cannabis oil from cannabis plants. On information and belief, the resultant cannabis extracts contain the native cannabinoid molecule CBGA.

257. CBGA may be converted into CBG by a chemical process called decarboxylation. CBG displays psychoactive and medicinal properties.

258. CBGA comprises a carboxyl group.

259. Decarboxylation removes the carboxyl group from the CBGA molecule to form a CBG molecule and a carbon dioxide molecule.

260. On information and belief, Defendants make cannabis distillate with processes that

modify the native cannabinoid molecule CBGA to form CBG and carbon dioxide.

261. On information and belief, compositions that Defendants provide for distillation comprise the native cannabinoid molecule CBGA.

262. On information and belief, Defendants perform short-path distillations on compositions comprising cannabinoids that include CBGA to make cannabis distillate.

263. On information and belief, Defendants operate one or more short-path distillation systems by providing compositions that comprise liquid-phase CBGA.

264. On information and belief, Defendants contact compositions comprising cannabinoids that include CBGA with energy to evaporate cannabinoids, and the energy converts the native cannabinoid molecule CBGA into (i) a carbon dioxide molecule and (ii) a modified cannabinoid molecule in a gas phase, *i.e.*, CBG.

265. On information and belief, Defendants condense gas phase CBG into a liquid distillate, which Defendants perform in short-path distillation systems by contacting the gas phase CBG with a cold trap. *See, e.g.*, Ex. BO.

266. On information and belief, Defendants make and sell products that comprise cannabis distillate containing THC, CBD, and CBG, for example, &Shine-branded Durban Poison vape cartridges. *See* Ex. U; *see also* Ex. R, Ex. T, Ex. BI, Ex. BQ.

267. On information and belief, Defendants operate their short-path distillation systems to make liquid distillates that comprise each of CBD, THC, and CBG. *See, e.g.*, Ex. R, Ex. T, Ex. U, Ex. BI, Ex. BQ.

268. On information and belief, Defendants make cannabis distillate with methods that satisfy all other elements of claims 1, 8, 14, 15, and 18 of the ’402 patent for the reasons recited in Paragraphs Nos. 192-235 above with respect to the ’248 patent.

**C. <u>The ’181 Patent</u>**

269. Plaintiff repeats and realleges the allegations contained in Paragraphs 1-268 as though fully set forth herein.

270. Claim 1 of the ’181 patent recites:

> A method to chemically modify a cannabinoid molecule, comprising:
>
> providing a composition comprising cannabinoids, wherein the composition comprises an extracted oil that was extracted from a plant material of the genus *Cannabis,* the extracted oil comprises the cannabinoids, the cannabinoids comprise a native cannabinoid molecule, and the native cannabinoid molecule comprises a carboxyl group;
>
> coating a heated surface with the composition at a surface-area-to-volume ratio of the composition that is greater than 500 per meter;
>
> contacting the composition with sufficient energy from the heated surface to convert the native cannabinoid molecule into (i) a carbon dioxide molecule and (ii) a modified cannabinoid molecule in a gas phase;
>
> contacting the modified cannabinoid molecule with a heat sink to condense the modified cannabinoid molecule into a condensed cannabinoid molecule in a liquid distillate; and
>
> collecting the liquid distillate,
>
> wherein:
>
> the method comprises converting less than 2 percent of the native cannabinoid molecule into cannabinol by mole;
>
> the method is performed such that the liquid distillate comprises the condensed cannabinoid molecule and cannabinol at a molar ratio of greater than 100:1; and
>
> the method is performed such that the liquid distillate comprises cannabinol at a concentration of less than 0.8 percent by weight.

271. Claim 2 of the ’181 patent recites:

> A method to chemically modify a cannabinoid molecule, comprising:

providing a composition comprising cannabinoids, wherein the composition comprises an extracted oil that was extracted from a plant material of the genus *Cannabis,* the extracted oil comprises the cannabinoids, the cannabinoids comprise a native cannabinoid molecule, and the native cannabinoid molecule comprises a carboxyl group;

coating a heated surface with the composition at a surface-area-to-volume ratio of the composition that is greater than 500 per meter;

contacting the composition with sufficient energy from the heated surface to convert the native cannabinoid molecule into (i) a carbon dioxide molecule and (ii) a modified cannabinoid molecule in a gas phase;

contacting the modified cannabinoid molecule with a heat sink to condense the modified cannabinoid molecule into a condensed cannabinoid molecule in a liquid distillate; and

collecting the liquid distillate,

wherein the method is performed such that:

the liquid distillate comprises the condensed cannabinoid molecule and cannabinol at a molar ratio of greater than 100:1; and

the liquid distillate comprises the condensed cannabinoid molecule and delta-8-tetrahydrocannabinol at a molar ratio of greater than 300:1.

272. Claim 4 of the ’181 patent depends from Claim 2 and recites:

the native cannabinoid molecule is tetrahydrocannabinolic acid;

the modified cannabinoid molecule is tetrahydrocannabinol; and

the condensed cannabinoid molecule is tetrahydrocannabinol.

273. Claim 9 of the ’181 patent recites:

A method to chemically modify a cannabinoid molecule, comprising:

providing a composition comprising cannabinoids, wherein the composition comprises an extracted oil that was extracted from a plant material of the genus *Cannabis,* the extracted oil comprises the cannabinoids, the cannabinoids comprise a native cannabinoid molecule, and the native cannabinoid molecule comprises a carboxyl group;

> coating a heated surface with the composition at a surface-area-to-volume ratio of the composition that is greater than 500 per meter, wherein the heated surface is a surface of a thin-film evaporator;
>
> contacting the composition with sufficient energy from the heated surface to convert the native cannabinoid molecule into (i) a carbon dioxide molecule and (ii) a modified cannabinoid molecule in a gas phase;
>
> contacting the modified cannabinoid molecule with a heat sink to condense the modified cannabinoid molecule into a condensed cannabinoid molecule in a liquid distillate; and
>
> collecting the liquid distillate.

274. Claim 19 of the ’181 patent depends from Claim 9 and recites:

> the native cannabinoid molecule is tetrahydrocannabinolic acid;
>
> the modified cannabinoid molecule is tetrahydrocannabinol;
>
> the condensed cannabinoid molecule is tetrahydrocannabinol; and
>
> the method is performed such that the liquid distillate comprises the condensed cannabinoid molecule and cannabinol at a molar ratio of greater than 100:1.

275. Claim 21 of the ’181 patent depends from Claim 9 and recites:

> the native cannabinoid molecule is tetrahydrocannabinolic acid;
>
> the modified cannabinoid molecule is tetrahydrocannabinol;
>
> the condensed cannabinoid molecule is tetrahydrocannabinol; and
>
> the method is performed such that the liquid distillate comprises the condensed cannabinoid molecule and delta-8-tetrahydrocannabinol at a molar ratio of greater than 300:1.

276. On information and belief, Defendants make cannabis distillate with methods that satisfy each and every limitation of at least claims 1, 2, 4, 9, 19, and 21 of the ’181 patent either literally or under the doctrine of equivalents.

277. Defendants extract cannabis oil from flowers of cannabis plants, which are plants of the genus *Cannabis*.

278. On information and belief, Defendants provide extracted oils that were extracted from plant material of the genus *Cannabis*, which comprise cannabinoids, for distillation via short-path distillation systems.

279. On information and belief, extracted oils that Defendants provide for distillation comprise THCA, and distillation of the extracted oils necessarily must convert less than 2% of the THCA into CBN by mole to arrive at compositions comprising greater than 80% THC and less than 0.8% CBN by mass.

280. Delta-8-tetrahydrocannabinol (Δ8-THC) is a thermal oxidation product of THC.

281. On information and belief, Defendants make products from cannabis distillates that contain greater than 70% THC and less than 0.1% Δ8-THC by mass. *See, e.g.*, Ex. BQ. Such distillates comprise THC and Δ8-THC at a molar ratio of greater than 300:1.

282. Defendants' wiped-film and roller-film distillation systems are thin-film evaporators.

283. On information and belief, Defendants make cannabis distillate with methods that satisfy all other elements of claims 1, 2, 4, 9, 19, and 21 of the '181 patent for the reasons recited in Paragraph Nos. 192-235 above with respect to the '248 patent and in Paragraph Nos. 243-267 above with respect to the '402 patent.

**D. <u>The '214 Patent</u>**

284. Plaintiff repeats and realleges the allegations contained in Paragraphs 1-283 as though fully set forth herein.

285. Claim 1 of the '214 patent recites:

> A method to produce a product comprising a cannabinoid, comprising:
>
> (a) providing a composition comprising cannabinoids, wherein (i) the composition has a surface area, (ii) the composition comprises

less than 15 percent water by weight, (iii) the composition comprises an oil, (iv) the oil comprises the cannabinoids, (v) the cannabinoids comprise a native cannabinoid molecule, (vi) the native cannabinoid molecule comprises a carboxyl group, (vii) the native cannabinoid molecule is tetrahydrocannabinolic acid (THCA), (viii) the composition comprises at least 5 percent by weight of the cannabinoids, which are selected from tetrahydrocannabinolic acid (THCA), cannabidiolic acid (CBDA), tetrahydrocannabivarin carboxylic acid (THCVA), tetrahydrocannabinol (THC), cannabidiol (CBD), and tetrahydrocannabivarin (THCV), and (ix) the composition comprises at least 1 percent by weight tetrahydrocannabinolic acid (THCA);

(b) contacting the composition with a heated surface and exposing the surface area of the composition to a vacuum to convert the native cannabinoid molecule into a modified cannabinoid molecule in a gas phase, wherein (x) contacting the composition with the heated surface heats the cannabinoids of the composition by conduction, and (xi) the modified cannabinoid molecule is tetrahydrocannabinol (THC);

(c) condensing the modified cannabinoid molecule into a condensed cannabinoid molecule in a distillate, wherein (xii) the condensed cannabinoid molecule is tetrahydrocannabinol (THC); and

(d) collecting the distillate.

286. Claim 2 of the ’214 patent depends from Claim 1 and recites:

the distillate comprises condensed cannabinoids selected from tetrahydrocannabinol (THC), tetrahydrocannabivarin (THCV), cannabidiol (CBD), and cannabinol (CBN);

the condensed cannabinoids comprise tetrahydrocannabinol (THC) and cannabinol (CBN); and

the condensed cannabinoids comprise less than 2 percent cannabinol (CBN) by weight.

287. Claim 4 of the ’214 patent depends from Claim 1 and recites:

providing a vaporizer cartridge comprising a chamber and a heating element; and

filling the chamber of the vaporizer cartridge with at least a portion of the distillate to create thermal communication between the heating element and the portion of the distillate.

288. Claim 5 of the ’214 patent depends from Claim 1 and recites:

> providing a distillation apparatus, wherein:
>
> the distillation apparatus is a thin-film evaporator and/or a short-path distillation apparatus;
>
> the heated surface is a surface of the distillation apparatus;
>
> contacting the composition with the heated surface comprises coating the heated surface with the composition;
>
> the oil is an extracted oil from the genus Cannabis; and
>
> heating the cannabinoids of the composition by conduction comprises contacting the composition with sufficient energy to convert the native cannabinoid molecule into (A) a carbon dioxide molecule and (B) the modified cannabinoid molecule in the gas phase.

289. Claim 6 of the ’214 patent depends from Claim 1 and recites:

> providing a distillation apparatus, wherein:
>
> the distillation apparatus is a thin-film evaporator and/or a short-path distillation apparatus;
>
> the heated surface is a surface of the distillation apparatus;
>
> contacting the composition with the heated surface comprises coating the heated surface with the composition;
>
> the oil is an extracted oil from the genus *Cannabis*;
>
> heating the cannabinoids of the composition by conduction comprises contacting the composition with sufficient energy to convert the native cannabinoid molecule into (A) a carbon dioxide molecule and (B) the modified cannabinoid molecule in the gas phase; and
>
> the distillate comprises cannabinol (CBN) at a concentration of less than 2 percent by weight.

290. Claim 8 of the ’214 patent depends from Claim 1 and recites:

> providing a distillation apparatus, wherein:

> the distillation apparatus is a thin-film evaporator and/or a short-path distillation apparatus;
>
> the heated surface is a surface of the distillation apparatus;
>
> contacting the composition with the heated surface comprises coating the heated surface with the composition;
>
> the oil is an extracted oil from the genus *Cannabis*;
>
> heating the cannabinoids of the composition by conduction comprises contacting the composition with sufficient energy to convert the native cannabinoid molecule into (A) a carbon dioxide molecule and (B) the modified cannabinoid molecule in the gas phase;
>
> the gas phase lacks sulfur dioxide at a concentration greater than 5 parts per million by volume;
>
> the distillate comprises one or both of cannabidiol (CBD) and tetrahydrocannabinol (THC) at a combined concentration of greater than 60 percent by weight; and
>
> the distillate comprises cannabinol (CBN) at a concentration of less than 0.5 percent by weight.

291. Claim 11 of the ’214 patent depends from Claim 1 and recites:

> the distillate comprises one or both of cannabidiol (CBD) and tetrahydrocannabinol (THC) at a combined concentration of greater than 70 percent by weight; and
>
> the distillate comprises cannabinol (CBN) at a concentration of less than 0.5 percent by weight.

292. Claim 18 of the ’214 patent recites:

> A method to produce a product comprising a cannabinoid, comprising:
>
> (a) providing a distillation apparatus, wherein (i) the distillation apparatus is a thin-film evaporator and/or a short-path distillation apparatus;
>
> (b) providing a composition comprising cannabinoids, wherein (ii) the composition has a surface area, (iii) the composition comprises less than 15 percent water by weight, (iv) the composition comprises an oil, (v) the oil comprises the cannabinoids, (vi) the oil is an

extracted oil from the genus *Cannabis*, (vii) the cannabinoids comprise a native cannabinoid molecule, (viii) the native cannabinoid molecule comprises a carboxyl group, (ix) the native cannabinoid molecule is tetrahydrocannabinolic acid (THCA), (x) the composition comprises at least 5 percent by weight of the cannabinoids, which are selected from tetrahydrocannabinolic acid (THCA), cannabidiolic acid (CBDA), tetrahydrocannabivarin carboxylic acid (THCVA), tetrahydrocannabinol (THC), cannabidiol (CBD), and tetrahydrocannabivarin (THCV), and (xi) the composition comprises at least 1 percent by weight tetrahydrocannabinolic acid (THCA);

(c) contacting the composition with a heated surface and exposing the surface area of the composition to a vacuum to convert the native cannabinoid molecule into a modified cannabinoid molecule in a gas phase, wherein (xii) the heated surface is a surface of the distillation apparatus, (xiii) contacting the composition with the heated surface comprises coating the heated surface with the composition, (xiv) contacting the composition with the heated surface heats the cannabinoids of the composition by conduction, (xv) heating the cannabinoids of the composition by conduction comprises contacting the composition with sufficient energy to convert the native cannabinoid molecule into (A) a carbon dioxide molecule and (B) the modified cannabinoid molecule in the gas phase, and (xvi) the modified cannabinoid molecule is tetrahydrocannabinol (THC);

(d) condensing the modified cannabinoid molecule into a condensed cannabinoid molecule in a distillate less than 360 seconds after converting the native cannabinoid molecule into the modified cannabinoid molecule in the gas phase, wherein (xvii) the condensed cannabinoid molecule is tetrahydrocannabinol (THC); and

(e) collecting the distillate.

293. Claim 19 of the ’214 patent depends from Claim 18 and recites:

the distillate comprises condensed cannabinoids selected from tetrahydrocannabinol (THC), cannabidiol (CBD), tetrahydrocannabivarin (THCV), and cannabinol (CBN); and

the condensed cannabinoids comprise less than 2 percent cannabinol (CBN) as a percentage by weight of the condensed cannabinoids.

294. Claim 20 of the ’214 patent depends from Claim 18 and recites:

providing a vaporizer cartridge comprising a chamber and a heating element; and

> filling the chamber of the vaporizer cartridge with at least a portion of the distillate to create thermal communication between the heating element and the portion of the distillate.

295. On information and belief, Defendants make cannabis distillate with methods that satisfy each and every limitation of at least claims 1, 2, 4-6, 8, 11, and 18-20 of the ’214 patent either literally or under the doctrine of equivalents.

296. Defendants make products comprising cannabinoids such as Rise and &Shine-branded vape cartridges according to methods by which Defendants introduce cannabis extracts (*i.e.*, compositions comprising cannabinoids) into short-path distillation systems.

297. On information and belief, the short-path distillation systems that Defendants operate include wiped-film and roller-film distillation systems, which are thin-film evaporators. *See, e.g.*, Ex. V, Ex. BP.

298. The compositions comprising cannabinoids each have a surface area when introduced into Defendants’ short-path distillation system.

299. On information and belief, the compositions comprising cannabinoids that Defendants introduce into short-path distillation systems comprise less than 15% water by weight.

300. The compositions comprising cannabinoids that Defendants introduce into short-path distillation systems are oils that Defendants extract from plants of the genus *Cannabis*. On information and belief, the oils comprise cannabinoids including the native cannabinoid molecule THCA, which comprises a carboxyl group.

301. On information and belief, the compositions comprising cannabinoids that Defendants introduce into short-path distillation systems comprise at least 5% by weight of the cannabinoids THCA and THC.

302. On information and belief, the compositions comprising cannabinoids that Defendants introduce into short-path distillation systems comprise at least 1% by weight THCA.

303. On information and belief, Defendants practice the methods disclosed and claimed in the Asserted Patents to make distillates that comprise greater than 80% THC, less than 0.8% CBN, and a molar ratio of THC to CBN of at least 100:1.

304. Defendants operate each short-path distillation system by contacting a cannabis extract with a heated surface of the distillation system and exposing the surface area of the cannabis extract to a vacuum to contact the cannabis extract with sufficient energy to convert the liquid-phase native cannabinoid molecule THCA into carbon dioxide and the gas-phase modified cannabinoid molecule THC.

305. On information and belief, the gas phase within each distillation system that Defendants operate consists predominantly of cannabinoids and carbon dioxide, and the gas phase lacks sulfur dioxide at a concentration greater than 5 parts per million by volume.

306. On information and belief, Defendants operate wiped-film distillation systems by coating a heated surface of the distillation systems with a thin film of cannabis extract, which is performed by one or more wipers of a wiped-film distillation system.

307. On information and belief, Defendants operate roller-film distillation systems by coating a heated surface of the distillation systems with a thin film of cannabis extract, which is performed by one or more rollers of a roller-film distillation system.

308. Defendants heat cannabinoids in their short-path distillation systems by conduction.

309. Defendants operate short-path distillation systems by condensing gas-phase THC into liquid-phase THC (*i.e.*, a condensed cannabinoid molecule) in a distillate and then collecting the distillate.

310. On information and belief, Defendants operate short-path distillation systems by condensing gas-phase THC into liquid-phase THC less than 360 seconds after converting liquid-

phase THCA into gas-phase THC.

311. On information and belief, distillates that Defendants collect from their short-path distillation systems comprise THC at a concentration of at least 80% by weight and CBN at a concentration of less than 0.5% by weight. *See, e.g.*, Ex. R, Ex. T, Ex. U, Ex. BI.

312. On information and belief, Defendants provide vaporizer cartridges that each comprise a chamber and a heating element, and Defendants fill the chamber of each vaporizer cartridge with distillate that they collect from their short-path distillation systems to create thermal communication between the heating element of the vaporizer cartridge and the distillate. Defendants thereby manufacture, for example, Rise and &Shine-branded vaporizer cartridges. *See, e.g.*, Ex. T, Ex. BS.

313. On information and belief, Defendants make cannabis distillate with methods that satisfy all other elements of claims 1, 2, 4-6, 8, 11, and 18-20 of the ’214 patent for the reasons recited in Paragraph Nos. 192-235 above with respect to the ’248 patent, in Paragraph Nos. 243-267 above with respect to the ’402 patent, and in Paragraph Nos. 277-282 above with respect to the ’181 patent.

## COUNT I
## INFRINGEMENT OF U.S. PATENT NO. 10,669,248

314. Plaintiff repeats and realleges the allegations contained in Paragraphs 1-313 as though fully set forth herein.

### A. Direct Infringement (35 U.S.C. §§ 271(a) and (g))

315. For the reasons set forth in detail above, on information and belief, Defendants have been and are still directly infringing, literally and/or under the doctrine of equivalents, one or more claims of the ’248 patent, including at least claims 1, 2, 8, and 12, by practicing processes to make cannabis distillate that satisfy all of the limitations of said claims in the United

States without authorization. Thus, Defendants are liable for infringement of the ’248 patent under 35 U.S.C. § 271(a).

316. For the reasons set forth in detail above, on information and belief, Defendants have been and are still directly infringing, literally and/or under the doctrine of equivalents, one or more claims of the ’248 patent, including at least claims 1, 2, 8, and 12, by offering to sell, selling, or using within the United States cannabis-distillate-containing products that are made by a process patented in the ’248 patent without authorization. Thus, Defendants are liable for infringement of the ’248 patent under 35 U.S.C. § 271(g).

317. On information and belief, Defendant GTI has been and is still directly infringing, literally and/or under the doctrine of equivalents, one or more claims of the ’248 patent, including at least claims 1, 2, 8, and 12, through its direct involvement in the infringing activities of its subsidiaries and alter egos, including but not limited to its Florida subsidiary and alter ego KSGNF III. KSGNF III conducts activities that constitute direct infringement of the ’248 patent under 35 U.S.C. § 271(a) and (g). GTI is liable for the infringement of its subsidiaries and alter egos, including KSGNF III, under both alter ego and agency precedent, for example, because GTI and its subsidiaries are essentially the same company, because GTI has the right and ability to control its subsidiaries’ infringing acts, and because GTI receives a direct financial benefit from the infringement of its subsidiaries including KSGNF III.

318. NES has suffered damages as a result of Defendants’ infringement of the ’248 patent. In addition, NES will continue to suffer severe and irreparable harm unless this Court issues a permanent injunction prohibiting Defendants, their agents, servants, employees, and representatives, and all others acting in active concert therewith from infringing the ’248 patent.

**B. <u>Induced Infringement (35 U.S.C. § 271(b))</u>**

319. Defendants have had actual knowledge of both the ’248 patent and that their processes to make cannabis distillate infringe at least one claim thereof at least as of the filing date of this complaint.

320. On information and belief, subsidiaries and alter egos of GTI, including KSGNF III, perform processes to make cannabis distillate that directly infringe at least claims 1, 2, 8, and 12 of the ’248 patent under 35 U.S.C. § 271(a) and (g).

321. On information and belief, GTI actively, knowingly, and intentionally instructed, directed, and/or advised—and continues to actively, knowingly, and intentionally instruct, direct, and/or advise—its subsidiaries and alter egos, including KSGNF III, to perform processes that directly infringe at least claims 1, 2, 8, and 12 of the ’248 patent.

322. On information and belief, GTI actively, knowingly, and intentionally induced—and continues to actively, knowingly, and intentionally induce—its subsidiaries and alter egos, including KSGNF III, to sell products made by processes that directly infringe at least claims 1, 2, 8, and 12 of the ’248 patent in the United States.

323. On information and belief, GTI controls the manufacture and sale of products by its subsidiaries including KSGNF III in Florida.

324. On information and belief, GTI sells products in Florida, including in this District, that bear the names of GTI proprietary product brands including, for example, &Shine branded vape cartridges. *See*, *e.g.*, Ex. R, Ex. T, Ex. U, Ex. BI.

325. On information and belief, subsidiaries and alter egos of GTI located in various states make and sell many of the same products. For example, on information and belief, GTI’s subsidiary and alter ego KSGNF III makes and sells &Shine-branded Durban Poison vape

cartridges in Florida, and a different GTI subsidiary and alter ego makes and sells &Shine-branded Durban Poison vape cartridges in Virginia. *See* Ex. U, Ex. BH.

326. On information and belief, GTI directs and instructs its subsidiaries and alter egos to make these products in their respective states based upon procedures and standards that GTI dictates.

327. On information and belief, GTI created, established, and enforces upon its subsidiaries and alter egos, including KSGNF III, standard operating procedures that infringe claims of the ’248 patent. *See*, *e.g.*, Ex. BT.

328. Thus, on information and belief, GTI actively, knowingly, and intentionally induced, encouraged, and facilitated—and continues to actively, knowingly, and intentionally induce, encourage, and facilitate—its subsidiaries and alter egos, including KSGNF III, to directly infringe at least claims 1, 2, 8, and 12 of the ’248 patent under 35 U.S.C. § 271(b).

329. NES has suffered damages as a result of Defendants’ infringement of the ’248 patent. In addition, NES will continue to suffer severe and irreparable harm unless this Court issues a permanent injunction prohibiting Defendants, their agents, servants, employees, and representatives, and all others acting in active concert therewith from infringing the ’248 patent.

## COUNT II
## INFRINGEMENT OF U.S. PATENT NO. 11,643,402

330. Plaintiff repeats and realleges the allegations contained in Paragraphs 1-329 as though fully set forth herein.

### A. Direct Infringement (35 U.S.C. §§ 271(a) and (g))

331. For the reasons set forth in detail above, on information and belief, Defendants have been and are still directly infringing, literally and/or under the doctrine of equivalents, one or more claims of the ’402 patent, including at least claims 1, 8, 14, 15, and 18, by practicing

processes to make cannabis distillate that satisfy all of the limitations of said claims in the United States without authorization. Thus, Defendants are liable for infringement of the ’402 patent under 35 U.S.C. § 271(a).

332. For the reasons set forth in detail above, on information and belief, Defendants have been and are still directly infringing, literally and/or under the doctrine of equivalents, one or more claims of the ’402 patent, including at least claims 1, 8, 14, 15, and 18, by offering to sell, selling, or using within the United States cannabis-distillate-containing products that are made by a process patented in the ’402 patent without authorization. Thus, Defendants are liable for infringement of the ’402 patent under 35 U.S.C. § 271(g).

333. On information and belief, Defendant GTI has been and is still directly infringing, literally and/or under the doctrine of equivalents, one or more claims of the ’402 patent, including at least claims 1, 8, 14, 15, and 18 through its direct involvement in the infringing activities of its subsidiaries and alter egos, including but not limited to its Florida subsidiary and alter ego KSGNF III. KSGNF III conducts activities that constitute direct infringement of the ’402 patent under 35 U.S.C. § 271(a) and (g). GTI is liable for the infringement of its subsidiaries and alter egos including KSGNF III under both alter ego and agency precedent, for example, because GTI and its subsidiaries are essentially the same company, because GTI has the right and ability to control its subsidiaries’ infringing acts, and because GTI receives a direct financial benefit from the infringement of its subsidiaries including KSGNF III.

334. NES has suffered damages as a result of Defendants’ infringement of the ’402 patent. In addition, NES will continue to suffer severe and irreparable harm unless this Court issues a permanent injunction prohibiting Defendants, their agents, servants, employees, and representatives, and all others acting in active concert therewith from infringing the ’402 patent.

**B. <u>Induced Infringement (35 U.S.C. § 271(b))</u>**

335. Defendants have had actual knowledge of both the ’402 patent and that their processes to make cannabis distillate infringe at least one claim thereof at least as of the filing date of this complaint.

336. On information and belief, subsidiaries and alter egos of GTI, including KSGNF III, perform processes to make cannabis distillate that directly infringe at least claims 1, 8, 14, 15, and 18 of the ’402 patent under 35 U.S.C. § 271(a) and (g).

337. On information and belief, GTI actively, knowingly, and intentionally instructed, directed, and/or advised—and continues to actively, knowingly, and intentionally instruct, direct, and/or advise—its subsidiaries and alter egos, including KSGNF III, to perform processes that directly infringe at least claims 1, 8, 14, 15, and 18 of the ’402 patent.

338. On information and belief, GTI actively, knowingly, and intentionally induced—and continues to actively, knowingly, and intentionally induce—its subsidiaries and alter egos, including KSGNF III, to sell products made by processes that directly infringe at least claims 1, 8, 14, 15, and 18 of the ’402 patent in the United States.

339. On information and belief, GTI controls the manufacture and sale of products by its subsidiaries including KSGNF III in Florida.

340. On information and belief, KSGNF III sells products in Florida, including in this District, that bear the names of GTI proprietary product brands including, for example, &Shine vape cartridges. *See*, *e.g.*, Ex. R, Ex. T, Ex. U, Ex. BI.

341. On information and belief, subsidiaries and alter egos of GTI located in various states manufacture and sell many of the same products. For example, on information and belief, GTI’s Florida subsidiary and alter ego KSGNF III makes and sells &Shine vape cartridges in

Florida, and a different GTI subsidiary and alter ego makes and sells &Shine-branded Durban Poison vape cartridges in Virginia. *See*, *e.g.*, Ex. U, Ex. BH.

342. On information and belief, GTI directs and instructs its subsidiaries and alter egos to make these products in their respective states based upon procedures and standards that GTI dictates.

343. On information and belief, GTI created, established, and enforces upon its subsidiaries and alter egos, including KSGNF III, standard operating procedures that infringe the ’402 patent. *See*, *e.g.*, Ex. BT.

344. Thus, on information and belief, GTI actively, knowingly, and intentionally induced, encouraged, and facilitated—and continues to actively, knowingly, and intentionally induce, encourage, and facilitate—its subsidiaries and alter egos, including KSGNF III, to directly infringe at least claims 1, 8, 14, 15, and 18 of the ’402 patent under 35 U.S.C. § 271(b).

345. NES has suffered damages as a result of Defendants’ infringement of the ’402 patent. In addition, NES will continue to suffer severe and irreparable harm unless this Court issues a permanent injunction prohibiting Defendants, their agents, servants, employees, and representatives, and all others acting in active concert therewith from infringing the ’402 patent.

## COUNT III
## INFRINGEMENT OF U.S. PATENT NO. 12,297,181

346. Plaintiff repeats and realleges the allegations contained in Paragraphs 1-345 as though fully set forth herein.

### A. Direct Infringement (35 U.S.C. §§ 271(a) and (g))

347. For the reasons set forth in detail above, on information and belief, Defendants have been and are still directly infringing, literally and/or under the doctrine of equivalents, one or more claims of the ’181 patent, including at least claims 1, 2, 4, 9, 19, and 21, by practicing

processes to make cannabis distillate that satisfy all of the limitations of said claims in the United States without authorization. Thus, Defendants are liable for infringement of the ’181 patent under 35 U.S.C. § 271(a).

348. For the reasons set forth in detail above, on information and belief, Defendants have been and are still directly infringing, literally and/or under the doctrine of equivalents, one or more claims of the ’181 patent, including at least claims 1, 2, 4, 9, 19, and 21, by offering to sell, selling, or using within the United States cannabis-distillate-containing products that are made by a process patented in the ’181 patent without authorization. Thus, Defendants are liable for infringement of the ’181 patent under 35 U.S.C. § 271(g).

349. On information and belief, Defendant GTI has been and is still directly infringing, literally and/or under the doctrine of equivalents, one or more claims of the ’181 patent, including at least claims 1, 2, 4, 9, 19, and 21, through its direct involvement in the infringing activities of its subsidiaries and alter egos, including but not limited to its Florida subsidiary and alter ego KSGNF III. KSGNF III conducts activities that constitute direct infringement of the ’181 patent under 35 U.S.C. § 271(a) and (g). GTI is liable for the infringement of its subsidiaries and alter egos including KSGNF III under both alter ego and agency precedent, for example, because GTI and its subsidiaries are essentially the same company, because GTI has the right and ability to control its subsidiaries’ infringing acts, and because GTI receives a direct financial benefit from the infringement of its subsidiaries including KSGNF III.

350. NES has suffered damages as a result of Defendants’ infringement of the ’181 patent. In addition, NES will continue to suffer severe and irreparable harm unless this Court issues a permanent injunction prohibiting Defendants, their agents, servants, employees, and representatives, and all others acting in active concert therewith from infringing the ’181 patent.

### B. Induced Infringement (35 U.S.C. § 271(b))

351. Defendants have had actual knowledge both of the '181 patent and that their processes to make cannabis distillate infringe at least one claim thereof at least as of the filing date of this complaint.

352. On information and belief, GTI's subsidiaries and alter egos, including KSGNF III, perform processes to make cannabis distillate that directly infringe at least claims 1, 2, 4, 9, 19, and 21 of the '181 patent under 35 U.S.C. § 271(a) and (g).

353. On information and belief, GTI actively, knowingly, and intentionally instructed, directed, and/or advised—and continues to actively, knowingly, and intentionally instruct, direct, and/or advise—its subsidiaries and alter egos, including KSGNF III, to perform processes that directly infringe at least claims 1, 2, 4, 9, 19, and 21 of the '181 patent.

354. On information and belief, GTI actively, knowingly, and intentionally induced—and continues to actively, knowingly, and intentionally induce—its subsidiaries and alter egos, including KSGNF III, to sell products made by processes that directly infringe at least claims 1, 2, 4, 9, 19, and 21 of the '181 patent in the United States.

355. On information and belief, GTI controls the manufacture and sale of products by its subsidiaries including KSGNF III in Florida.

356. On information and belief, KSGNF III sells products in Florida, including in this District, that bear the names of GTI proprietary product brands including, for example, &Shine vape cartridges. *See*, *e.g.*, Ex. R, Ex. T, Ex. U, Ex. BI.

357. On information and belief, subsidiaries and alter egos of GTI located in various states manufacture and sell many of the same products. For example, on information and belief, GTI's Florida subsidiary and alter ego KSGNF III makes and sells &Shine-branded Durban Poison

vape cartridges in Florida, and a different GTI subsidiary and alter ego makes and sells &Shine-branded Durban Poison vape cartridges in Virginia. *See*, *e.g.*, Ex. U, Ex. BH.

358. On information and belief, GTI directs and instructs its subsidiaries and alter egos to make these products in their respective states based upon procedures and standards that GTI dictates.

359. On information and belief, GTI created, established, and enforces upon its subsidiaries and alter egos, including KSGNF III, standard operating procedures that infringe the ’181 patent. *See*, *e.g.*, Ex. BT.

360. Thus, on information and belief, GTI actively, knowingly, and intentionally induced, encouraged, and facilitated—and continues to actively, knowingly, and intentionally induce, encourage, and facilitate—its subsidiaries and alter egos, including KSGNF III, to directly infringe at least claims 1, 2, 4, 9, 19, and 21 of the ’181 patent under 35 U.S.C. § 271(b).

361. NES has suffered damages as a result of Defendants’ infringement of the ’181 patent. In addition, NES will continue to suffer severe and irreparable harm unless this Court issues a permanent injunction prohibiting Defendants, their agents, servants, employees, and representatives, and all others acting in active concert therewith from infringing the ’181 patent.

## **COUNT IV**
## **INFRINGEMENT OF U.S. PATENT NO. 12,420,214**

362. Plaintiff repeats and realleges the allegations contained in Paragraphs 1-361 as though fully set forth herein.

### **A. Direct Infringement (35 U.S.C. §§ 271(a) and (g))**

363. For the reasons set forth in detail above, on information and belief, Defendants have been and are still directly infringing, literally and/or under the doctrine of equivalents, one or more claims of the ’214 patent, including at least claims 1, 2, 4-6, 8, 11, and 18-20, by

practicing processes to make cannabis distillate that satisfy all of the limitations of said claims in the United States without authorization. Thus, Defendants are liable for infringement of the ’214 patent under 35 U.S.C. § 271(a).

364. For the reasons set forth in detail above, on information and belief, Defendants have been and are still directly infringing, literally and/or under the doctrine of equivalents, one or more claims of the ’214 patent, including at least claims 1, 2, 4-6, 8, 11, and 18-20, by offering to sell, selling, or using within the United States cannabis-distillate-containing products that are made by a process patented in the ’214 patent without authorization. Thus, Defendants are liable for infringement of the ’214 patent under 35 U.S.C. § 271(g).

365. On information and belief, Defendant GTI has been and is still directly infringing, literally and/or under the doctrine of equivalents, one or more claims of the ’214 patent, including at least claims 1, 2, 4-6, 8, 11, and 18-20, through its direct involvement in the infringing activities of its subsidiaries and alter egos, including but not limited to its Florida subsidiary and alter ego KSGNF III. KSGNF III conducts activities that constitute direct infringement of the ’214 patent under 35 U.S.C. § 271(a) and (g). GTI is liable for the infringement of its subsidiaries and alter egos including KSGNF III under both alter ego and agency precedent, for example, because GTI and its subsidiaries are essentially the same company, because GTI has the right and ability to control its subsidiaries’ infringing acts, and because GTI receives a direct financial benefit from the infringement of its subsidiaries including KSGNF III.

366. NES has suffered damages as a result of Defendants’ infringement of the ’214 patent. In addition, NES will continue to suffer severe and irreparable harm unless this Court issues a permanent injunction prohibiting Defendants, their agents, servants, employees, and

representatives, and all others acting in active concert therewith from infringing the ’214 patent.

**B. Induced Infringement (35 U.S.C. § 271(b))**

367. Defendants have had actual knowledge both of the ’214 patent and that their processes to make cannabis distillate infringe at least one claim thereof at least as of the filing date of this complaint.

368. On information and belief, GTI’s subsidiaries and alter egos, including KSGNF III, perform processes to make cannabis distillate that directly infringe at least claims 1, 2, 4-6, 8, 11, and 18-20 of the ’214 patent under 35 U.S.C. § 271(a) and (g).

369. On information and belief, GTI actively, knowingly, and intentionally instructed, directed, and/or advised—and continues to actively, knowingly, and intentionally instruct, direct, and/or advise—its subsidiaries and alter egos, including KSGNF III, to perform processes that directly infringe at least claims 1, 2, 4-6, 8, 11, and 18-20 of the ’214 patent.

370. On information and belief, GTI actively, knowingly, and intentionally induced—and continues to actively, knowingly, and intentionally induce—its subsidiaries and alter egos, including KSGNF III, to sell products made by processes that directly infringe at least claims 1, 2, 4-6, 8, 11, and 18-20 of the ’214 patent in the United States.

371. On information and belief, GTI controls the manufacture and sale of products by its subsidiaries including KSGNF III in Florida.

372. On information and belief, KSGNF III sells products in Florida, including in this District, that bear the names of GTI proprietary product brands including, for example, &Shine vape cartridges. *See*, *e.g.*, Ex. R, Ex. T, Ex. U, Ex. BI.

373. On information and belief, subsidiaries and alter egos of GTI located in various states manufacture and sell many of the same products. For example, on information and belief,

GTI's Florida subsidiary and alter ego KSGNF III makes and sells &Shine-branded Durban Poison vape cartridges in Florida, and a different GTI subsidiary and alter ego makes and sells &Shine-branded Durban Poison vape cartridges in Virginia. *See*, *e.g.*, Ex. U, Ex. BH.

374. On information and belief, GTI directs and instructs its subsidiaries and alter egos to make these products in their respective states based upon procedures and standards that GTI dictates.

375. On information and belief, GTI created, established, and enforces upon its subsidiaries and alter egos, including KSGNF III, standard operating procedures that infringe the '214 patent. *See*, *e.g.*, Ex. BT.

376. Thus, on information and belief, GTI actively, knowingly, and intentionally induced, encouraged, and facilitated—and continues to actively, knowingly, and intentionally induce, encourage, and facilitate—its subsidiaries and alter egos, including KSGNF III, to directly infringe at least claims 1, 2, 4-6, 8, 11, and 18-20 of the '214 patent under 35 U.S.C. § 271(b).

NES has suffered damages as a result of Defendants' infringement of the '214 patent. In addition, NES will continue to suffer severe and irreparable harm unless this Court issues a permanent injunction prohibiting Defendants, their agents, servants, employees, and representatives, and all others acting in active concert therewith from infringing the '214 patent.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully requests the following relief:

(a) A judgment that Defendants have infringed the '248, '402, '181, and '214 patents;

(b) A judgment and order permanently enjoining Defendants, together with their directors, officers, agents, servants, employees, attorneys, parents, subsidiaries, divisions, affiliates, and other related business entities, and all persons in active concert or privity with

them, and their successors and assigns, from directly or indirectly infringing the ’248, ’402, ’181, and ’214 patents;

(c) A judgment that awards NES damages adequate to compensate for Defendants’ infringing activities, including lost profits, but in no event less than a reasonable royalty, in accordance with 35 U.S.C. § 284, including supplemental damages for any post-verdict infringement up until entry of final judgment with an accounting, as needed, together with pre-judgment and post-judgment interest on the damages awarded;

(d) In the event that a permanent injunction is not granted, damages for any continuing future infringement of the ’248, ’402, ’181, and ’214 patents;

(e) A judgment declaring that Defendants’ infringement has been willful and awarding enhanced damages under 35 U.S.C. § 284;

(f) Finding that this case is exceptional under 35 U.S.C. § 285, and awarding NES its reasonable attorneys’ fees incurred in connection with this action;

(g) Awarding NES its costs and expenses in this action; and

(h) Awarding NES such other and further relief as this Court deems just and appropriate.

Dated: January 12, 2026

Respectfully Submitted,

*/s/ William Barry Blum*

William Barry Blum
VENABLE LLP
wbblum@venable.com
801 Brickell Ave. Suite 1500
Miami, FL 33131
Telephone: (305) 349-2339
Facsimile: (305) 349-2310

Frank C. Cimino, Jr.
VENABLE LLP
600 Massachusetts Avenue, NW
Washington, DC 20001
Telephone: (202) 344-4569
Facsimile: (202) 344-8300
fccimino@venable.com

William E. Solander
James R. Tyminski
Robert E. Bugg
VENABLE LLP
151 West 42nd Street
New York, NY 10036
Telephone: (212) 370-6241
Facsimile: (212) 307-5598
wsolander@venable.com
jtyminski@venable.com
rebugg@venable.com

*Attorneys for Plaintiff Natural Extraction Systems, LLC*